EXHIBIT B

Jason D. Boren (#7816)
Nathan R. Marigoni (#14885)
BALLARD SPAHRDouglas C. Smith (#10805)
LEWIS BRISBOIS BISGAARD & SMITH LLP
One Utah Center1218 East 7800 South, Suite 800 300
201 South Main Street
Salt Lake City, Utah 84111-2221
TelephoneSandy, UT 84094
tel: (801) 531-3000251.7341
Facsimilefax: (801) 531-3001562.5510
borenj@ballardspahrdouglas.smith@lewisbrisbois.com
marigonin@ballardspahr.com

Richard W. Miller (GA #65257) Pro
Peter Stasiewicz (IL No. 6290832) (pro hac vice to be submitted forthcoming)
BALLARD SPAHR LLP
999 Peachtree Street, NE Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9340
Facsimile: (678) 420-9301
millerrw@ballardspahrARCTURUS LAW FIRM
211 West Wacker Drive # 323
Chicago, Illinois, 60606
tel: (312) 957-6194
fax: (312) 489-8307
pete.stasiewicz@arcturuslaw.com

Attorneys for Plaintiff, Larada Sciences, Inc.

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LARADA SCIENCES, INC., a Delaware Corporation, | **[PROPOSED] FIRST AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | **Case No.: 2:18-cv-00551-BCWRJS-PMW** |

| PEDIATRIC HAIR SOLUTIONS CORPORATION, a North Carolina Corporation, **JOHN E. FASSLER, M.D., SHEILA M. FASSLER, and FLOSONIX VENTURES, LLC, a Wyoming LLC.**<br><br><span align="right">~~Defendant~~**Defendants**.</span> | Judge Robert J. Shelby<br><br>Magistrate Judge ~~Brooke C. Wells~~**Paul M. Warner** |

Plaintiff, Larada Sciences, Inc. ("Larada" or "LSI"), by and through its undersigned counsel, ~~Ballard Spahr~~Arcturus Law Firm LLP, hereby complains against ~~Defendant~~Defendants Pediatric Hair Solutions Corporation ("PHS" or "Licensee"), Sheila Fassler, Dr. John Fassler, and FloSonix as follows:

### INTRODUCTORY STATEMENT

Larada is a Utah corporation that produces patented head lice treatment and FDA-cleared Devices (previously known as the LouseBuster™ and currently marketed under the name AirAllé®). Larada licenses that technology to treatment clinics in defined exclusive territories; many of these clinics were established for the express purpose of using Larada's technology and know-how. Defendant PHS operates several such clinics and is bound by a number of agreements to keep proprietary information received regarding Larada's novel device and business confidential. PHS's founder and owners, Dr. John Fassler and Sheila Fassler, are individually bound by separate agreements – Dr. Fassler through the agreement naming him as Larada's National Medical Director and Sheila Fassler (who served on Larada's Advisory Board) bound by her personal guarantee on a Lease Agreement with Larada.  However, PHS – at the Fasslers' direction and contrary to its contractual obligations – caused Larada's Devices to be

reverse-engineered and brought to market under the name FloSonix, via a company of the same name founded by the Fasslers in direct competition with Larada. PHS and the Fasslers have further misappropriated Larada's confidential and proprietary information by attempting to build out their own network of licensees based on Larada's processes, strategies, and pricing information.  Larada seeks injunctive relief to safeguard its confidential information and trade secrets as well as damages in excess of $15 million.

## PARTIES

1.      Larada is a corporation organized under the laws of Delaware and with its principal place of business at 154 East Myrtle Ave., Ste 304, Murray, Utah 84107.

2.      PHS is a corporation incorporated under the laws of North Carolina with its principal address at 6923 Shannon Willow Rd., Ste 100, Charlotte, NC 28226-1331. PHS operates head lice treatment centers in North Carolina, South Carolina, and Ohio.

3.      PHS operates head lice treatment centers in FloSonix Ventures, LLC ("FloSonix") is a Wyoming limited liability company with its principal address at 6923 Shannon Willow Rd, Suite 100, Charlotte, NC 28226-1331.

4.      Sheila Fassler is a resident and citizen of North Carolina, South.

3.5.      Dr. John Fassler is a resident and citizen of North Carolina, and Ohio..

## JURISDICTION AND VENUE

4.6.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and complete diversity of citizenship exists.

5.7.      This Court has subject-matter jurisdiction over Larada's Lanham Act claims

and Larada's Defend Trade Secrets Act claims under 28 U.S.C. § 1331.

6.8.      This Court has supplemental jurisdiction over Larada's state-law claims under

28 U.S.C. § 1367.

7.9.      PHS has consented to personal jurisdiction and venue in the District of Utah

pursuant to a series of License Agreements entered into between PHS and Larada.

8.10.      This Court has personal jurisdiction over PHS pursuant to Utah's long-arm

statute, Utah Code Ann. § 78B-3-205(1), and the forum-selection clause of the License

Agreements entered into between Larada and PHS.

11.      This Court has personal jurisdiction over Dr. John Fassler pursuant to Utah's

long-arm statute, Utah Code Ann. § 78B-3-205(1)-(3), and Dr. Fassler's repeated visits to Utah

for meetings related to the Consulting Agreement and License Agreements.

12.      This Court has personal jurisdiction over FloSonix Ventures pursuant to Utah's

long-arm statute, § 78B-3-205(3), as FloSonix caused a tortious injury within the state.

13.      Sheila Fassler consented to personal jurisdiction and venue in Utah pursuant to

her personal guarantee and agreement to be bound by the terms of the Lease Agreement between

Larada and PHS.

9.14.      Venue is proper in this court Underunder 28 U.S.C. § 1391 as PHS is subject to

the Court's personal jurisdiction in this venue pursuant to the forum-selection clause of the

License Agreements entered into between Larada and PHS. and Sheila Fassler.

**GENERAL ALLEGATIONS**

10.15.      Larada manufactures and markets devices for the treatment of head lice through

a patented method of applying heated air to the scalp (the "Devices"). Although heated air had

4

previously been shown to kill *body* lice and eggs, one of Larada's founders was the first to demonstrate the effectiveness of heated air on human *head* lice and eggs. It was not until the development of Larada's Devices (a process that took years) that a commercially viable method was found to kill head lice and eggs through the application of heated air in specific temperature ranges and applied in a specific way.

16.     The Devices are operated by individuals who are instructed and certified by Larada according to Larada's propriety operator's manual.

17.     Larada currently grants licenses to others to use the Devices and related products in the operation of independent head-lice-treatment clinics ("Clinics") pursuant to license agreements. and franchise agreements. The Clinics operate in defined, exclusive territories, and the vast majority of Clinics were formed specifically for the purpose of licensing and using Larada's technology, which was the only FDA-cleared and effective hot-air product for head lice treatment on the market.

18.     Prior to this licensing arrangement, Larada made the Devices (then marketed under the name "LouseBuster™") available to Clinics via lease agreements and rental agreements.

19.     On or about Nov. 16, 2010, Larada entered into such a lease agreement with PHS (the "Lease Agreement"). The Lease Agreement was executed by Sheila Fassler, who also personally guaranteed "full performance and payment of all obligations . . . including, without limitation, the covenants not to compete, or disclose confidential trade information and agree to be personally bound thereby."

20.     Section 10.1 of the Lease Agreement provided:

During the Term of this Agreement, Lessee will be made aware of confidential or proprietary information or trade secrets of the Company

5

(including information relating to the Products and any Product formulations, or present or anticipated Products, processes, know-how, sales strategies, business affairs, financial and pricing information, contractual arrangements, identities of employees, strategic plans, or marketing plans) (collectively the "Confidential Information"). During and after the Term of this Agreement, Lessee agrees to maintain in strict confidence and not to use or disclose the Confidential Information, . . . . Lessee further agrees not to attempt to discover any Confidential Information by reverse engineering, decompiling or in any other unauthorized manner. . . . The parties agree that this Section shall survive any expiration or termination of this Agreement.

21.     The Lease Agreement's original term was two years; it was followed by a Rental Agreement on January 23, 2013 which allowed PHS exclusive use of Larada's Devices in nine North Carolina and South Carolina metro areas, and also contained restrictions on PHS's use of Larada's confidential or proprietary information.

11.22.     On or about August 31, 2015, Larada and PHS entered into a series of license agreements which allowed PHS to use Larada's Devices at numerous Clinics operated by PHS in Georgia, South Carolina, North Carolina, and Ohio (the "License Agreements").

12.23.     The License Agreements stateprovide, among other things,

**5.      License Payment, Handling, Shipping, Taxes:**

       a.      During the Term, Licensee shall make the following payments:

i.      One-time, non-refundable License Payment equal to $5,000;
ii.     Per-treatment Use Fee of $25 for each Treatment;
iii.    $500 Refundable Deposit for each Device and
iv.     Actual shipping and handling costs per Device, Treatment Products and Consumables, which shall be due at the time of shipment by LSI.

       ***

**9.      Payments and Fees, Terms of Payment, Taxes, Record Keeping and Audit Rights**

       a.      The Use Fee for each Device shall be paid by Licensee on or before the tenth business day of the month following the month in which the Use Fee was calculated.

b.      The Use Fee for each Device that is due under this Agreement shall be paid by the use of Credit Card Payments…. If Licensee fails to have a sufficient credit limit on the due date for each Device and/or Use Fee, Licensee may be assessed a $50.00-per-Device late fee ("Late Fee"). LSI may also charge interest on the missing or late payment at the greater of eighteen percent (18%) per annum or the maximum amount permitted by the law of the state in which Licensee is located ("Default Rate") plus court costs and reasonable attorneys' fees and collection fees, with or without suit, incurred in collecting any past due balance….

\*\*\*

**10.       Proprietary Information and Innovation**

\*\*\*

b.      During the Term of this Agreement and following its expiration or termination for any reason, Licensee agrees that without LSI's prior written consent, which consent may be granted or denied for any reason or for no reason, it shall not . . . disassemble, reverse-engineer, or otherwise replicate, duplicate or copy any component or portion of the Device or any Consumable . . . .

\*\*\*

j.      Licensee further agrees to:

\*\*\*

ii.      Refrain from using any component of the Proprietary Information in any business or in any manner not specifically authorize or approved by LSI in writing;

iii.      Exercise the highest degree of diligence and make every effort to maintain the absolute confidentiality of all such Property [*sic*] Information during and after the Term of this Agreement.

k.      During the Term or any Renewal Term, Licensee may create, design or otherwise improve upon any component of the Proprietary Information (an "Innovation"). Any Innovation will be deemed the sole and exclusive property of LSI. Upon the creation of any Innovation, Licensee will immediately notify LSI in writing and in detail, the nature of the Innovation. LSI shall have the sole and exclusive right to approve or disapprove of any such Innovation for any reason or for no reason at all . . . . Licensee agrees that LSI does now and will own the right, title and interest to the Innovation. . . .

\*\*\*

7

**13.       Default, Termination, Surrender and Remedies**

  a.  Subject only to Force Majeure, effective upon receipt of written notice, said notice presented to Licensee in accordance with Section 18 below, LSI may terminate this agreement without providing the Licensee any right to cure upon the occurrence of any one or more of the following events (each of which event is deemed to be an "Incurable Default"):

\*\*\*

   iii.  Licensee fails to have a sufficient credit limit such that LSI is unable to charge Licensee's credit card for any amount due hereunder within ten (10) days after receiving notice that such fees or amounts are overdue.

\*\*\*

  c.  Upon termination of this Agreement by either party as permitted herein, Licensee shall: (i) immediately pay all amounts then due to LSI in accordance with the terms of this Agreement; (ii) within five (5) business days after such termination, surrender and return to LSI all Devices and all unused consumables; (iii) remove any signage or indication that Licensee has the right to offer Treatments using the Device or that contain the Marks; and, (iv) take such other commercially reasonable steps as may be necessary to dissociate Licensee from LSI….

\*\*\*

**18.       Miscellaneous Provisions**

\*\*\*

  h.  This Agreement shall be interpreted in accordance with the laws of the state of Utah without consideration of any conflict of laws. Jurisdiction and venue for any proceeding related to this Agreement shall be in a court of competent jurisdiction in Salt Lake County, Utah. Licensee specifically covenants and agrees that the choice of law, venue, and jurisdiction are fair and reasonable.

\*\*\*

  o.  In the event that either Party brings any action in reference to this Agreement, the "Prevailing Party" in such action shall be awarded all reasonable, attorneys' fees, expert witness fees, court costs and discovery costs incurred. For purposes of this Agreement, the Prevailing Party shall be deemed

8

that Party that has prevailed on a majority of the issues decided by the trier of fact, law or equity.

13. ~~PHS made timely payments under the agreement until late 2016 or early 2017, when PHS ceased making payments to Larada.~~

24. At the same time it entered into the License Agreements with PHS, Larada entered into an agreement ("Consulting Agreement") with Dr. John Fassler, pursuant to which he became National Medical Director for Larada's Lice Clinics of America ("LCA") Network. Dr. Fassler is a co-founder of PHS but entered into the Consulting Agreement in his personal capacity.

25. The LCA Network is made up of various Clinics nationwide that use Larada's Devices in their practices while generally operating under their own names. Most of these Clinics were not in existence prior to entering a licensing agreement with Larada, so the exclusive right to use Larada's Devices and other confidential and proprietary information within a defined exclusive territory was a key component in starting their businesses and joining the LCA Network.

26. The Consulting Agreement provided, among other things:

**6. Confidential Information**. Consultant agrees that during the term of this Agreement and thereafter it will not use or permit the use of Company's Confidential Information in any manner or for any purpose not expressly set forth in this Agreement, will hold such Confidential Information in confidence and protect it from unauthorized use and disclosure, and will not disclose such Confidential Information to any third parties. "Confidential Information" as used in this Agreement shall mean all information disclosed by Company to Consultant, whether during or before the term of this Agreement, that is not generally known in the Company's trade or industry and shall include, without limitation: (a) concepts and ideas relating to the development and distribution of content in any medium or to the current, future and proposed products or services of Company or its subsidiaries or affiliates; (b) trade secrets, drawings, inventions and know-how; (c) information

9

regarding plans for research, development, new service offerings or products, marketing and selling, business plans, business forecasts, budgets and unpublished financial statements, licenses and distribution arrangements, prices and costs, suppliers and customers; (d) existence of any business discussions, negotiations or agreements between the Parties; and (e) any information regarding the skills and compensation of employees, contractors or other agents of Company or its subsidiaries or affiliates. . . . . All Confidential Information furnished to Consultant by Company is the sole and exclusive property of Company or its suppliers or customers.

28.     Dr. Fassler was initially retained to promote Larada's Devices in the medical community, to create a training manual for best practices in marketing to and establishing relationships with physician practices, and to develop education and quality assurance programs for Larada affiliates, among other services.

29.     In late 2014, PHS's President Sheila Fassler was appointed to the LCA Network Affiliate Advisory Board, at her request. The Advisory Board was made up of approximately seven representatives from Clinics across the country.

30.     At the inaugural Affiliate Advisory Board meeting in January 2015, Sheila Fassler was presented with sensitive and proprietary information from Larada's management team, including the development status of new products like Larada's handheld consumer-use devices; the new Lice Clinics of America brand; potential changes to treatment, pricing, and incentives for Larada affiliates; and Larada's new marketing strategy, which was presented by an outside marketing firm.

31.     In their roles with the LCA Network, Dr. Fassler and Sheila Fassler were privy to Larada's confidential and proprietary information, including its branding, research, marketing strategy, pricing strategy, product development, and licensee lists. At all times, PHS and the Fasslers were bound by the confidentiality provisions of the respective agreements they had entered into.

32.     Larada was not aware that by late 2014, PHS and the Fasslers had begun planning to use Larada's Device to create a competing duplicate.  Larada was also not aware that before the end of 2016 PHS had sent at least one of Larada's Devices to an engineering firm to use to design a competing device.

33.     In or around November 2016, Larada sent a beta version of its second-generation Device to PHS.

34.     Around the same time, PHS stopped making timely royalty payments as required under the License Agreements.

35.     Also around this time, without Larada's knowledge or approval, Dr. Fassler and Sheila Fassler met with a group of Larada's licensees to discuss ways of competing with Larada. Larada did not know about this meeting until after the filing of the initial Complaint of this matter.

15.36.    On or about February 1, 2017, PHS's President, Sheila Fassler, sent an email to Claire Roberts, Larada's Chief Executive Officer, acknowledging that PHS had not made its payments "in a timely fashion," because it was "trying to get a loan," and had been advised to "keep [its] revolving debt low and [its] cash flow high."

37.     In a February 10, 2017 meeting in Park City, Utah, Dr. John Fassler on behalf of PHS told Ms. Roberts that the license fees were indefensible because the Devices were little more than "heated air" and could not be patented because they were simply a "law of nature."

38.     Also at that February 10, 2017 meeting, Sheila Fassler and Dr. Fassler, on behalf of PHS, demanded that Larada drastically and retroactively reduce its per-treatment use fee if Larada wanted PHS to become current with its payments.

11

39.     Dr. Fassler threatened that PHS would go into direct competition with Larada if Larada did not accede to PHS's demands.

40.     Although Larada was not aware of it at the time, PHS and the Fasslers had no intention of catching up on their royalty payments, as they had already begun the process of reverse-engineering Larada Devices by sending at least one of the Devices to an outside design firm and using other Larada know-how in order to assemble the original FloSonix Device.

16.41.    On February 12, 2017, Ms. Roberts advised PHS of the late fees and interest that could be charged pursuant to the License Agreements and advised PHS of Larada's right to terminate the License Agreements if payments were not made.

17.42.    OnIn a letter sent on or about February 17, 2017, counsel for PHS requestedreiterated the Fasslers' demand for a lowered fee structure which PHS proposedto be retroactively applied to January 1, 2017.

18.43.    On or about February 22, 2017, Ms. Roberts informed PHS that Larada would only consider a revised fee schedule if PHS were to bring its account(s) current and pay all of the amounts then presently due.

19.44.    PHS informed Larada that it would not be making the past due payments unless Larada agreed to the new fee schedule and retroactively applied that schedule.

20.45.    PHS failed and/or refused to cure the past due payments or to make any subsequent payments as required by the License Agreements.

21.46.    Accordingly, on or about March 10, 2017, Larada provided PHS with written notice that the License Agreements were terminated by virtue of PHS's default of those agreements.

22.47.     This letter instructed PHS to: "(i) immediately pay all amounts currently due to Larada; (ii) within five (5) business days of receipt of this letter, surrender and return to Larada … all Devices and all unused Consumables; (iii) remove any signage or indication that [PHS] ha[s] the right to offer Treatments using the Device, including any signage inside or outside of your business and any of Larada's Marks, including photos and videos, on your website and any other social media pages; (iv) destroy any hard copies and digital copies of marketing materials that use Larada's Marks; and (v) take such other steps necessary to disassociate yourself from Larada."

23.48.     PHS has failed and refused to pay Larada the amounts due and owing.

37.     On information and belief, PHS continues to hold and possess one of Larada's Devices.

49.     PHS has failed to timely return all of Larada's Devices and unused Consumables.

50.     PHS continued to use Larada's Devices through April 2017, and has not paid Larada for use of the Devices from January 2017 through April 2017 under the License Agreements or otherwise.

51.     PHS began returning their first-generation Larada Devices shortly after the March termination letter and returned the last of the first-generation units on May 17, 2017. However, PHS never returned the second-generation Device that was sent to it in November 2016. On information and belief, this Device was disassembled, reverse-engineered and served as the basis for the FloSonix Device.

25.52.     PHS has failed to take the required steps to dissociate itself from Larada including, but not limited to, failing to remove all references to Larada and/or its Marks,

Devices, and/or other Intellectual Property from its online marketing materials and internet websites for which PHS has the authority or ability to do so.

~~28.PHS has failed to timely return all of Larada's Devices and unused Consumables.~~

53.      ~~PHS continued to use Devices through April~~In July 2017, ~~and has not paid~~ Larada became aware ~~for~~ ~~use of~~ the ~~Devices from January 2017 through April 2017~~first time of a device under the name FloSonix being used by PHS in PHS' clinics.

54.      The similarities between Larada's Devices and the original FloSonix Device are striking. Both use a flexible hose from a wheel-mounted vertical base unit attached to a disposable applicator tip arranged with five staggered rows of 5 or 6 nozzles (alternatingly) and appear to be operated in essentially identical fashion. (FloSonix has apparently changed the nozzle design on more recent versions of the FloSonix Device)

55.      Larada has filed suit against PHS in the Western District of North Carolina for PHS's infringement of four separate patents related to the Devices.

56.      Despite Dr. Fassler's insistence that Larada's Devices were little more than "heated air," PHS's website describes the FloSonix as delivering "heated air through the hair in a timed and specific pattern," just like the Larada Devices.

~~27.~~57.      PHS, the Fasslers, and FloSonix could not have brought the FloSonix Device to market by May 2017 without duplicating and reverse-engineering Larada's Devices and without using Larada's know-how in direct breach of the confidentiality provisions of the Lease Agreement and License ~~Agreements or otherwise.~~Agreement. PHS and the Fasslers had already provided the Devices to third-parties and begun the process of reverse-engineering the Devices by the time PHS stopped making payments in November 2016.

14

58.     On information and belief, in early May of 2017, the Fasslers (a) formed FloSonix Ventures LLC, in Wyoming; (b) registered a trademark for "FloSonix" with the U.S. Patent and Trademark Office; and (c) registered the flosonix.com domain name. The LLC and trademark filings were registered under the name of the same attorney who issued PHS's February 2017 demand letter.

59.     On information and belief, FloSonix Ventures LLC was founded by the Fasslers for the express purpose of using Larada's trade secrets and Confidential or Proprietary Information to develop the FloSonix Device, bring it to market, and compete with Larada.

28.60.    On information and belief, PHS and the Fasslers disclosed the Larada Device to third parties, disassembled, reverse-engineered, or otherwise replicated, duplicated, or copied the Device to create a competing product called the FloSonix device Device, in violation of Section 10 of the License Agreements., Section 6 of the Consulting Agreement, and Section 10.1 of the Lease Agreement. The use of other Larada know-how in producing and operating the FloSonix Device was a further breach of these provisions.

61.     PHS failed to inform Larada that it had made an Innovation based on the Larada Devices as that term is defined in the License Agreement and took no steps to secure Larada's ownership rights to the FloSonix Device.

62.     PHS has been using FloSonix Devices in all seven PHS clinics from at least mid-2017 and continuing to the present.

63.     PHS, FloSonix, and the Fasslers have been marketing, leasing, or selling and lease their wrongfully reverse-engineered FloSonix Device to lice treatment clinics, including other Clinics in the LCA Network that are using the Larada Devices under license agreements with Larada, some of which have left the LCA Network to use the FloSonix Device.

15

64.     PHS, FloSonix, and the Fasslers used additional confidential and proprietary information they had misappropriated from Larada to further these efforts, including Larada's sales, marketing, and pricing strategies. For example, FloSonix requires its potential lessees to purchase applicator tips, hoses and filters from FloSonix, just as the Lease Agreement required Larada's clients to purchase applicator tips, hoses, and filters from Larada. In fact, the price and quantity for the applicator tips quoted in an early FloSonix proposed lease agreement was identical to Larada's applicator tips under the Lease Agreement: both were $8/each and sold in a box of 100.

65.     Defendants continue to use sales and marketing materials related to Larada's Devices to promote the FloSonix Device and develop a competing network of clinics, although on information and belief, the FloSonix Device is not FDA-cleared and does not deliver results on par with Larada's Devices.

66.     Defendants' wrongful acts related to Larada's Confidential or Proprietary Information, including reverse-engineering the Larada Device, misappropriating Larada's trade secrets, and breach of their respective confidentiality agreements, have harmed Larada.

~~29.~~67.     PHS owes Larada $84,810.00 under the License Agreements for order fees, treatment fees, territory fees, and device late fees through April 2017, exclusive of interest.

68.     Larada was further damaged by Defendants' wrongful appropriation and use of Larada's Devices to create the FloSonix Device as well as Defendants' use of the FloSonix Device and other Larada Confidential or Proprietary Information.

69.     Larada has been further damaged by Defendants' use of wrongfully obtained sales, marketing, and pricing information being used by Defendants to attempt set up a rival network of clinics using the FloSonix Device, negatively impacting Larada's relationships with

its current Clinics (most of which were established specifically to use Larada's technology) as well as Larada's ability to establish new Clinics.

70.   Larada has been further damaged by lost revenues from PHS and other current, former, and potential licensees in excess of $7 million.

71.   Larada has suffered additional consequential damages, including loss of goodwill, in excess of $5 million.

**<u>FIRST CAUSE OF ACTION</u>**
***(Breach of Contract against PHS)***

30.72.   Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

31.73.   Larada and PHS entered into contractually binding License Agreements on or about August 31, 2015.

32.74.   Except as excused by law or PHS's material breaches, Larada performed all of its obligations under the License Agreements.

33.75.   PHS breached the terms of the License Agreements by, without limitation, failing to make the payments required pursuant to the License Agreements, failing to timely return the Devices and unused Consumables upon the termination of the License Agreements, and failing to dissociate itself from Larada.

34.76.   PHS also breached the terms of the License Agreements by, without limitation disclosing the Devices to third parties, disassembling, reverse-engineering, or otherwise replicating, duplicating, or copying the Device or a component or portion of the Device to create the FloSonix deviceDevice, among other things.

77.      PHS also breached the terms of the License Agreements by using Larada's Proprietary Information to develop business strategies which PHS and FloSonix would use to compete with Larada.

78.      PHS further breached the License Agreement by creating an Innovation as described in Section 10(k) during the Term of the License Agreement but not notifying Larada about the Innovation nor taking any steps to give Larada its contractual ownership rights in the Innovation.

35.79.      As a direct result of PHS's breaches of the License Agreements, Larada has been damaged in an amount to be determined at trial but, in any event, no less than $84,810.00 plus interest at the statutory rate.

80.      Larada and PHS entered into the contractually binding Lease Agreement on or about Nov. 16, 2010.

81.      Except as excused by law or PHS's material breaches, Larada performed all of its obligations under the Lease Agreement.

36.82.      Larada is entitled to an award of its reasonable attorney fees incurred in this action pursuant to the terms of the License Agreements.

## SECOND CAUSE OF ACTION
### (*Breach of Implied Covenant of Good Faith and Fair Dealing*)

37.83.      Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

38.84.      Larada and PHS entered into a series of contractually binding License Agreements on or about August 31, 2015, which, like all contracts under Utah Law, contain an implied covenant of good faith and fair dealing.

39.85.     Except as excused by law or PHS's material breaches, Larada performed all of its obligations under the License Agreements.

40.86.     PHS unfairly interfered with Larada's right to receive the benefits of the License Agreements by defaulting on the past-due Use Fees and knowingly maintaining wrongful possession of the Devices and unused Consumables without payment thereof.

41.87.     PHS breached the covenant of good faith and fair dealing by withholding payment due under the contract in an attempt to force Larada to agree to payment terms more favorable to PHS.

42.88.     As a direct result of PHS's breach of the implied covenants of the License Agreements, Larada suffered damages in an amount to be determined at trial but, in any event, no less than $84,810.00 plus interest at the statutory rate.

43.89.     Larada is entitled to an award of its reasonable attorney fees incurred in this action pursuant to the terms of the License Agreements.

### THIRD CAUSE OF ACTION
### (*Breach of Lease Agreement against Sheila Fassler*)

90.     Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

91.     Larada and PHS entered into contractually binding Lease Agreement on or about November 10, 2010. Sheila Fassler agreed to personally guarantee and be individually bound by all relevant provisions of that Lease Agreement.

92.     Except as excused by law or PHS's material breaches, Larada performed all of its obligations under the Lease Agreement.

93.      Sheila Fassler and PHS breached the terms of the Lease Agreement by reverse-engineering or otherwise replicating, duplicating, or copying the Device or components or portions of the Device to create the FloSonix Device.

94.      Sheila Fassler further breached the terms of the Lease Agreement and by misappropriating Larada's Confidential Information, conveying that Confidential Information to third-parties including engineers, designers, and FloSonix Ventures, LLC, in order to create the FloSonix Device, and using Larada's Confidential Information to develop FloSonix's business strategies.

95.      As a direct result of Sheila Fassler and PHS's breaches of the Lease Agreement, Larada has been damaged in an amount to be determined at trial.

96.      Larada is entitled to an award of its reasonable attorney fees incurred in this action pursuant to the terms of the Lease Agreement.

## FOURTH CAUSE OF ACTION
### (*Breach of Consulting Agreement against Dr. John Fassler*)

97.      Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

98.      Larada and Dr. John Fassler entered into contractually binding Consulting Agreement on or about August 31, 2015.

99.      Except as excused by law or Dr. Fassler's material breaches, Larada performed all of its obligations under the Consulting Agreement.

100.     Dr. Fassler breached the terms of the Consulting Agreement by disclosing Larada's Confidential Information to third-party engineers, manufacturers, manufacturers,

and FloSonix Ventures, LLC in order to create the FloSonix Device, and to develop FloSonix's business strategies.

101.     As a direct result of Dr. Fassler's breaches of the Consulting Agreement, Larada has been damaged in an amount to be determined at trial.

102.     Larada is entitled to an award of its reasonable attorney fees incurred in this action pursuant to the terms of the Consulting Agreement.

### FIFTH CAUSE OF ACTION
***(Trespass to Chattels)***

~~44.~~103.   Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

~~45.~~104.   Larada, at all times material hereto, was the lawful owner of the Devices, and PHS was merely a licensee entitled to use Larada's Devices in accordance with the License Agreements.

~~46.~~105.   After PHS breached the License Agreements, Larada provided PHS with notice that the License Agreements were terminated and demanded that Larada's Devices and unused Consumables be returned to Larada.

~~47.~~106.   ~~PHS~~Defendants failed to return the Devices to Larada and therefore willfully interfered with Larada's possession of the Devices without lawful justification.

~~48.~~107.   By maintaining possession of the Devices and failing to pay Larada for its possession or use thereof, ~~PHS~~Defendants wrongfully exercised control over Larada's personal property in violation of Larada's right to possession.

~~49.~~108.   The trespass represents a willful disregard for the rights of Larada, thereby entitling Larada to an award of punitive damages against ~~PHS~~Defendants.

50.109.   Larada has been damaged by ~~PHS's~~Defendants' trespass in an amount to be determined at trial.

~~FOURTH CAUSE OF ACTION~~
**SIXTH CAUSE OF ACTION**
(*Conversion against all Defendants*)

51.110.   Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

52.111.   Larada, at all times material hereto, was the lawful owner of the Devices, and PHS was merely a licensee entitled to use Larada's Devices in accordance with the License Agreement.

53.112.   ~~PHS~~Defendants interfered with Larada's exclusive right to possession of the Devices by wrongfully retaining possession of the Devices without payment, even after Larada provided PHS with proper notice of termination of the License Agreements and a demand for the return of the Devices.

54.113.   On information and belief, ~~PHS~~Defendants converted Larada's Devices with an intent to deprive Larada of its possession or use for a period of time.

55.114.   The conversion represents a willful disregard for the rights of Larada, thereby entitling Larada to an award of punitive damages against ~~PHS~~Defendants.

68.        Larada has been damaged by ~~PHS's~~Defendants' trespass in an amount to be determined at

115.        trial.

~~FIFTH~~**SEVENTH** CAUSE OF ACTION
(*Unjust Enrichment against all Defendants*)

57.28. Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

Beginning on or about August 31, 2015, upon the commencement of the relationship under the License Agreements,

116.     Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

58.117.    Larada conferred a benefit on PHSDefendants by licensing Larada's technology for PHS's PHS' use in accordance with the License Agreements, Lease Agreements, and Rental Agreement.

59.118.    PHSDefendants knew of and appreciated that benefit.

60.119.    PHS hasDefendants have retained that benefit without payment to Larada following PHS's default under the License Agreements and Larada's termination of the License Agreements.

61.120.    It is inequitable for PHSDefendants to retain the benefit without paying Larada sufficient value in return.

62.121.    PHS has been unjustly enriched in an amount to be determined at trial.

### SIXTHEIGHTH CAUSE OF ACTION
***(Trademark Infringement and Unfair
Competition Under the Lanham Act, 15
U.S.C. §§ 1051, et seq.)***

63.122.    Larada incorporates by reference all allegations of this Complaint as though fully set forth herein.

64.123.    Larada is the owner of a federal registration of the mark, AIRALLÉ, which is assigned Federal Registration Number 4,653,717 and is used on Larada's Devices.

65.124.   A true and correct copy of the federal registration for the AIRALLÉ mark is attached to this complaint as Exhibit A.

66.125.   The AIRALLÉ mark is an arbitrary and fanciful mark, and is entitled to the highest level of protection afforded by law.

67.126.   Larada has used the AIRALLÉ mark for many years in connection with its AirAllé® device. The AIRALLÉ signifies high quality products originating from Larada.

68.127.   Based on Larada's extensive advertising, sales, and the wide use of Larada's products to treat lice, AIRALLÉ has acquired secondary meaning so that any product bearing the AIRALLÉ mark is immediately associated by consumers, the public, and the trade as being a product of Larada.

69.128.   Larada has gone to great lengths to protect its name and to enforce the AIRALLÉ mark.

70.129.   The License Agreements provided PHS with knowledge that Larada has rights to enforce the AIRALLÉ mark against PHS.

71.130.   PHS's commercial marketing of its services on its social media sites, which are offered in the same channels of commerce and to the same class of consumers as the services associated with the AIRALLÉ mark, is aimed at and occurs across state lines and via the internet to consumers in all fifty states.

72.131.   Since the termination of the License Agreements, Larada has not authorized nor consented to PHS's use of the AIRALLÉ mark.

73.132.   PHS continued to use the AIRALLÉ mark in connection with its products and services, even after the termination of the License Agreements.

74.133.   PHS's use of the AIRALLÉ mark is likely to cause confusion or mistake among ordinary consumers about the source, sponsorship, affiliation, connection, association, and/or approval of the goods and services offered by PHS, by creating false, deceiving, and/or misleading impression(s) that such goods and services are created by Larada, and/or are sponsored by, affiliated with, or approved by Larada. Such confusingly similar use constitutes trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a).

75.134.   On information and belief, as a direct and proximate cause of PHS's acts as alleged herein, Larada has suffered, and will continue to incur, actual and statutory damages.

76.135.   Larada is entitled to disgorgement of all of PHS's profits relating to their bad faith, willful infringement of the AIRALLÉ mark, all damages sustained by Larada in amounts to be proven at trial, and the costs of this action.

77.136.   Upon information and belief, PHS has acted with reckless disregard for Larada's rights, and has willfully and maliciously engaged in infringing activities. Thus, this is an exceptional case pursuant to 15 U.S.C. § 1117(a).

78.137.   PHS's wrongful conduct has caused, and will continue to cause, Larada to suffer irreparable injury for which no adequate remedy at law exists. Accordingly, Larada is entitled to an order permanently enjoining PHS (i) from any further use of the AIRALLÉ mark, and (ii) from any other acts of infringement of any of Larada's marks.

**NINTH CAUSE OF ACTION**
***(Misappropriation of Trade Secrets under***
***18 U.S.C. § 1836 against all Defendants)***

138.   Larada had trade secrets relating to proprietary and confidential technology and know-how relating to the Devices, their use and operation, as well as other intellectual property

relating to the management, growth, and operation of a network of licensee clinics with exclusive territories.

139.     Larada reasonably protected its trade secrets, by entering into confidentiality agreements with PHS and the Fasslers personally prior to communicating any trade secrets to any of them.

140.     Larada's trade secrets derive value from their secrecy because they provide a novel method of treating head lice infestations and they further derive value from their role in supporting a profitable network of lice clinics licensees with exclusive territories.

141.     PHS and the Fasslers knew that Larada was providing them with trade secrets pursuant to confidentiality agreements.

142.     PHS and the Fasslers misappropriated Larada's trade secrets by using them to help create the FloSonix Device, quickly bring the FloSonix Device to market, develop a lease arrangement of their own to create a competing network of clinics, and directly soliciting existing Larada licensees and potential Larada licensees to join that network.

143.     PHS and the Fasslers' misappropriation occurred after May 1, 2016 or Defendants continued to misappropriate Larada's trade secrets after that date.

144.     FloSonix, is on information and belief owned and operated by the Fasslers and shares its principal office with PHS. FloSonix received Larada's trade secrets via PHS and/or the Fasslers.

145.     FloSonix knew or should have known at the time of disclosure that Larada's trade secrets were acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a

26

duty, in that the secrets were obtained by PHS and the Fasslers while they were all bound by their contractual confidentially obligations and their duties of loyalty to Larada.

146.     Defendants' appropriation of Larada's trade secrets was willful and malicious.

### TENTH CAUSE OF ACTION
#### (*Declaratory Judgment against PHS*)

147.     Defendants created an Innovation as that term is defined in Section 10(k) of the License Agreement, namely by slightly modifying the design of the Larada Devices into the FloSonix Devices.

148.     Pursuant to the terms of the License Agreement, Larada owns all rights to such Innovations (*i.e.* the FloSonix Devices) but was never notified of the creation of the Innovations.

149.     Aside from the financial injuries Larada has suffered, Larada is also being injured by Defendants' actions. These injuries include diminishment of Larada's goodwill and the disruption of business relationships.

150.     A declaration that Larada owns all rights to the FloSonix Devices is necessary to protect Larada from irreparable harm.

### PRAYER FOR RELIEF

WHEREFORE, Larada respectfully requests the following:

A.     Damages in an amount to be proven at trial, but no less than $~~84,810.00.~~15 million

B.     For all costs of suit incurred, including reasonable attorneys' fees and costs;

C.     Pre- and post-judgment interest at the statutory rates;

D.     Exemplary/punitive damages

E.     Injunctive relief prohibiting PHS from infringing Larada's intellectual property ~~and~~, using, selling, or promoting the FloSonix Device, and using any of Larada's Proprietary or Confidential Information.

F.      A declaration that Larada owns all right, title and interest in the FloSonix Device.

F.G.    For such other relief as the Court deems proper.

DATED this 11th___ day of July, 2018_____, 2020

/s/ Jason D. Boren_____
Jason D. Boren
Richard W. Miller
Nathan R. Marigoni
BALLARD SPAHRDouglas C. Smith
LEWIS BRISBOIS BISGAARD & SMITH LLP

Peter Stasiewicz (*pro hac vice*)
ARCTURUS LAW FIRM

*Attorneys for Plaintiff, Larada Sciences, Inc.*