Douglas C. Smith (#10805)
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
1218 East 7800 South, Suite 300
Sandy, UT 84094
tel: (801) 251.7341
fax: (801) 562.5510
douglas.smith@lewisbrisbois.com

Peter Stasiewicz (IL No. 6290832) (*pro hac vice*)
**ARCTURUS LAW FIRM**
211 West Wacker Drive # 323
Chicago, Illinois, 60606
tel: (312) 957-6194
fax: (312) 489-8307
pete.stasiewicz@arcturuslaw.com

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **LARADA SCIENCES, INC.**, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>**PEDIATRIC HAIR SOLUTIONS CORPORATION**, a North Carolina Corporation, *et al*.<br><br>Defendants. | **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br><br>Case No.: 2:18-cv-00551-RJS-PMW<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Paul M. Warner |

PHS all but admits that it breached the confidentiality provisions of the License Agreements. PHS admits that Kevin Dahlquist viewed and inspected the Larada Device – but argues that this is somehow not a breach because he only did so to avoid infringing Larada's

patents while producing a competing product. That admission, along with the exhibits submitted with Larada's initial motion show that Dahlquist received that device, disassembled it, and continually used it aid in the development of PHS's competing FloSonix Device – in other words, reverse-engineered it.

The overarching error in PHS's Response is the concept that the current FloSonix prototype is somehow sufficiently distinct from PHS's earliest prototypes created immediately following those breaches. Although PHS frequently refers to a singular "prototype" it is clear that there have been many iterations of the FloSonix Device, and there will likely continue to be more iterations in the future, if no injunction issues. What PHS fails to grasp is that each of these iterations are inseparable parts of a development process that began with PHS's breaches of the confidentiality provisions in the Larada Agreements. To the extent that PHS argues that an entirely new development process led to the current FloSonix prototype, that argument is directly contradicted by facts already before this Court.

PHS breached the Larada Agreements to get a massive boost in developing a product that would allow them to compete directly with Larada, and any product developed as a result of those breaches must be enjoined.

I. The Injunction Larada Seeks is Not Disfavored.

PHS argues that Larada seeks a type of injunction that is "disfavored" because it seeks to alter the status quo.[1] As Larada explained in its opening brief, the status quo is the last peaceable uncontestable status between the parties – *i.e.*, when the dispute began, not when the complaint was filed.[2]

---

[1] Dkt. # 96 at 13.

[2] *See* Dkt. # 79, Larada's Opening Memorandum ("Mem."), at 13 n. 61-62.

As to any further sale, use, marketing, manufacture of the FloSonix Device, the requested preliminary injunction is unquestionably meant to preserve the status quo. To the extent that the injunction is targeted at the FloSonix Devices already in use at PHS clinics and elsewhere, the fact that the injunction could be construed as mandatory does not mean that the injunction seeks to alter the status quo. Before the dispute arose, Larada's devices were protected by confidentiality agreements. PHS breached those agreements in order to produce the FloSonix Devices. PHS misunderstands the law on what constitutes the "status quo." A party cannot establish the status quo through clandestine activity like the secret breaches.[3]

PHS's argument that an injunction would give Larada the relief it seeks at trial also misses the mark. Larada seeks significant damages based on PHS's breaches in addition to injunctive relief. An injunction would prevent *future* lost profits, but cannot substitute for the millions of dollars in damages Larada has already suffered. Such damages are a major component of Larada's claims, and Larada will not receive all or even substantially all of its relief through a preliminary injunction.[4] Accordingly, Larada's motion should be evaluated under the usual preliminary injunctive framework, and not a heightened standard – but even under the heightened standard which requires more "closer scrutiny," Larada would be entitled to an injunction.[5]

II. **The Threat of Irreparable Harm to Larada is Established By Larada's Declarations, PHS-Produced Emails, and PHS's Response Submissions.**

---

[3] *Cobra N. Am., LLC v. Cold Cut Sys. Svenska AB*, 639 F. Supp. 2d 1217, 1229 (D. Colo. 2008); citing *Doubleclick Inc. v. Paikin*, 402 F.Supp.2d1251, 1255–56 (D. Colo. 2005).
[4] *See* Am. Compl, Dkt. # 86 at ¶¶ 70-71.
[5] *See O Centro Espirita Beneficente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

The fact that PHS knew that the FloSonix Device existed in 2017 does not preclude injunctive relief. This is not an infringement case – the mere existence of the FloSonix Device was not in itself actionable under the Larada Agreements. And while Larada may have *suspected* that PHS had breached its confidentiality provisions, it did not have evidence to prove the breaches in question here, because PHS concealed its development of the FloSonix. That evidence was unknown to Larada and only obtained during discovery in a related action.[6] (Indeed, PHS contends that Larada still doesn't have enough evidence to establish breaches).

Even after PHS received these documents, Larada did not perceive a threat of imminent harm, as the original FloSonix Devices were believed to be ineffective, and Larada internally believed that no further solicitation or marketing of the FloSonix Device was ongoing due to litigation and settlement negotiations.[7] It is the recent renewed marketing of the FloSonix Device that prompted the instant motion.[8] PHS's supporting declarations of former Larada clinic owners David Shirley and Adie Horowitz are consistent with this timeline – Shirley claims he did not arrange for a FloSonix Device until mid-December 2019; Horowitz entered into her agreement for a FloSonix around the same time.[9] Larada did not know about Shirley's FloSonix Device until February 2020.

As those declarations show, even without a public marketing campaign, Larada clinics have become aware of the existence of the FloSonix Device as an alternative to the Larada Device.[10] These declarations show that Larada's fear of irreparable harm is far more than

---

[6] Mem., Dkt. # 79 at 22.

[7] Mem., Dkt. # 79 at 21.

[8] *Id.*; Roberts Dec. ¶ 31.

[9] Shirley Dec. ¶ 7; Horowitz Dec. ¶ 8.

[10] *Id.*

speculative. Larada need not wait until dozens of franchisees switch to FloSonix; indeed, injunctive relief is available under the Federal Rules to prevent exactly that kind of damage.

The irreparable harm to Larada comes from the existence of the FloSonix Device, which would not exist in its current state but for PHS's breaches. If the FloSonix Device did not exist, existing Larada clinics would have one of three options: (1) renew or maintain agreements on Larada's terms, (2) negotiate new terms with Larada, or (3) forego the advantages of the Larada Device and attempt to operate without the benefit of a heated air device. (As PHS acknowledges, the Larada Device was unique in the market until the FloSonix Device was released.)[11] The wrongful existence of the FloSonix Device provides clinics a fourth option that directly harms Larada.

In addition to these recent defections, the threat of other irreparable harm was established in Larada's motion. For example, the motion is supported by an email Sheila Fassler wrote ▮ ▮.[12] Larada's motion is also supported by declarations from Larada officers establishing substantial risk of harm.[13] Larada disputes PHS's contention that these declarations rely on hearsay evidence – for example, whether there *really* ▮, as Larada's management has been informed, is not as important as the effect of that statement circulating among Larada franchises. Larada is already harmed by the perception that there is a legal alternative readily available - as evidenced by the former Larada clinics that have managed to acquire FloSonix Devices despite PHS's insistence that there is no formal marketing scheme. But

---

[11] J. Fassler Dec., ¶ 4

[12] Stasiewicz Dec. , Ex. K.

[13] Mem., Dkt. # 79 at 21, Roberts Dec. ¶¶ 32-34, Ward Dec. ¶ 17.

even if those statements are considered hearsay, they would still be appropriately before this Court, as preliminary injunction hearing are not subject to the same requirements as a full trial on the merits.[14]

Larada is thus at substantial risk of irreparable harm, as evidenced by Larada's submitted declarations, email from Sheila Fassler indicating her intent to create exclusive territories for the FloSonix device, and the declarations of FloSonix users submitted by PHS.

### III. PHS's Response All But Concedes That PHS Breached The Larada Agreements.

#### A. PHS's Breach of the License Agreements' Confidentiality Provisions Taints All Versions of the FloSonix Device.

PHS attempts to gloss over the obvious truth that PHS breached the License Agreements by providing a Larada Device to a third party, and then having that third-party disassemble it to learn how it works. PHS's position is in effect that the breach doesn't matter, because the *current* FloSonix Device is somehow not the product of that development process.

The inner workings of the current FloSonix prototype have almost no bearing on the fact of PHS's breaches, which occurred when PHS conveyed the Larada Device to ▮▮▮▮▮, and when ▮▮▮ disassembled and reverse-engineered the Larada Device to learn how it worked. Reverse-engineering is "[t]he process of discovering how an invention works by inspecting and studying it…"[15] and this is unquestionably what PHS did in conjunction with Dahlquist and ▮▮▮▮▮.[16]

---

[14] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) ("The Federal Rules of Evidence do not apply to preliminary injunction hearings."); *Talisker Corp. v. Prime W. Jordanelle, LLC*, No. 2:06-CV-1034 TC, 2008 WL 4279642, at *8 (D. Utah Sept. 12, 2008)(considering hearsay evidence in granting preliminary injunction).

[15] BLACK'S LAW DICTIONARY (11th ed. 2019).

[16] *See* Mem. at 10-11, Stasiewicz Dec. Exs A-E.

6

Having gained knowledge by studying the Larada Device in contravention of the License Agreements, any subsequently developed product is tainted by that breach – even if the earliest attempts to improve on the Larada Device without infringing on it initially proved fruitless. Knowing what *not* to do in developing a new device is second only to knowing exactly what *to* do.

PHS essentially was allowed to fast-forward past the years of development that Larada sunk into the creation of the Larada Device – costs that are naturally baked into the price at which Larada can offer its Devices to clinics. Through its breaches, PHS dramatically slashed its development costs and any resulting device can be offered at a lower cost. Larada is entitled to enforce the contractual provisions that were designed to protect it from this exact eventuality.

> The protection of trade secrets is essential to any society that wishes to reward inventiveness and diligent research. It is essential that [plaintiff] be allowed to reap the rewards of many years of hard work. [Plaintiff] has spent many thousands of dollars in developing its product line, and defendants . . . should not be allowed to appropriate that costly and diligent research effort.[17]

Even if later versions of the FloSonix Device were "based" on something other than the Larada Device, as PHS claims[18], the lessons learned from PHS's reverse-engineering continued to be used in the development of those devices.

Moreover, PHS's suggestion that the "current" FloSonix Device designed by ▮▮▮▮ was designed without input from Dahlquist and ▮▮▮▮▮▮ is factually untrue. Emails attached to Larada's motion directly contradict PHS's position. In January 2018, Kevin Dahlquist wrote that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[17] *Superior Flux & Mfg. Co. v. H&S Indus., Inc.*, No. C 79-2327, 1980 WL 30229, at *4 (N.D. Ohio Nov. 20, 1980)

[18] Resp. at 19.

███████████.[19] In February 2018, Dahlquist wrote █████████████████████████████████████████████████████████████████████████████████████████████████████████████.[20] All of these events show that the disassembled Larada Device was still being used for reverse-engineering purposes well after PHS's alleged purchase of parts for the ██████████████████████████████, and well after retention of ████████████ in September 2017 for development of the "current" prototype.[21] Even if the initial breaches did not completely taint the development process, these uses of Larada's materials constitute subsequent, independent breaches sufficient to support an injunction.

PHS cites *AssociationVoice, Inc. v. AtHomeNet, Inc.*,[22] but that case is inapposite as it relates to the copying of software under a copyright analysis. The *AssociationVoice* court found that although there was substantial evidence of defendant's access to the protected material, there was not sufficient evidence of copying. The contractual prohibitions in this case extend to much more than "copying" – they prohibit conveying the Devices to a third party, disassembling, and reverse-engineering. Even if PHS did not precisely (or even substantially) duplicate the Larada Device to create the FloSonix Device, it gained tremendously valuable knowledge by having the machine disassembled and reverse-engineered. And, as pointed out above, PHS continued to use the Larada Devices' components as integral parts of the development of the FloSonix.

Conveying the Larada Device to ██████████████ was a breach of the License Agreement. Having ██████ disassemble the Larada Device was a breach of the License Agreement. Inspecting

---

[19] Stasiewicz Dec. Ex. H, PHS 190662 at 1.

[20] Stasiewicz Dec. Ex. G, PHS 190665 at 1.

[21] S. Fassler Dec. ¶¶ 13, 18, Ex. 3.

[22] No. 10-cv-00109-CMA-MEH, 2011 U.S. Dist. LEXIS 1654, *30 (D. Colo Jan. 6, 2011), *see* Resp. at 20 n. 129.

and using the Larada Device to learn how it works – in other words, reverse-engineering it – was a breach of the License Agreement. Larada will be able to establish these breaches at trial.

### B. PHS's Submitted Declarations Confirm That the FloSonix Device Is An Innovation Owned By Larada Under the License Agreements.

It is undisputed that the FloSonix serves the exact same purpose as the Larada Devices – namely, using heated air to kill head lice and their eggs. It does so through the same basic functionality. PHS contends that the FloSonix Device is "completely different" other than the use of heated air, but this is a limited and inaccurate comparison. Both devices ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████.[23]

PHS's declarants Horowitz and Shirley make essentially identical distinctions between the Larada and FloSonix: they both state FloSonix is ████████████████████████ ████"[24] Although both Horowitz and Shirley state that the device is ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████.[25]

It is difficult to read Horowitz and Shirley's descriptions of the FloSonix as saying anything other than that they consider the FloSonix to be an improvement on the Larada Device. As Larada has explained, once PHS began innovating on the existing Larada design, all subsequent development incorporated that knowledge. The fact that PHS learned lessons from its first design

---

[23] Horowitz Dec ¶ 9.

[24] Horowitz Dec. ¶ 9; Shirley Dec. ¶ 10.

[25] Horowitz Dec. ¶¶ 9-10; Shirley Dec. ¶¶ 10-11.

and moved to a new design is precisely the sort of innovation on the existing Larada design that was contemplated by the Larada Agreements and prohibited to PHS without Larada's permission. Thus, Larada has a strong likelihood of establishing its ownership of the FloSonix Device at trial.

## IV. The Balance of Harms Clearly Favors Larada.

As discussed in Part II and its original Motion, Larada has presented evidence – not conclusory statements, as PHS argues – of significant threatened harm. PHS's own submissions underscore the reality of harm to Larada.

Any harm to PHS is, of course, its own doing, as explained in Larada's Motion.[26] While PHS attempts to cast the proposed injunction as mandatory with regards to PHS's own clinics, it is unclear what "affirmative steps" PHS would have to take to "unwind" the work it has done since 2017. If enjoined, PHS would simply not be allowed to use the FloSonix Device – nothing further would be necessary (save perhaps some verification that they have done so). PHS would be free to offer treatments in its clinics that do not use the FloSonix Device or are otherwise derived from Larada's confidential information.

PHS's argument that it would suffer reputational damage from an injunction could be used to defeat any threatened injunction. Although PHS cites *Packerware Corp. v. Corning Consumer Prods. Co.* for this proposition, the case is easily distinguished.[27] In that case, plaintiff established no actual or potential lost profits, so the damages to defendant's reputation easily tipped the balance in defendant's favor. Here, PHS's own documents show that Larada has already lost customers and Larada's evidence establishes the threat of many more, clearly outweighing any reputational harm that PHS has in any event brought upon itself.

---

[26] Mem. at 23-24

[27] Resp. at 23 n. 144; 895 F. Supp. 1438, 1453 (D. Kan. 1995)

PHS next makes the somewhat astonishing claim that all of this is actually Larada's fault, because Larada was not willing to overlook PHS's *other* breaches of contract (not before the Court on this motion) – namely, PHS's non-payment of fees pursuant to the Licensee Agreement.[28] Larada did not leave PHS "stranded" without a heated air device; Larada terminated the License Agreement with PHS for non-payment of fees in March 2017, following unsuccessful negotiations colored by PHS's threats (delivered by John Fassler) that PHS would go into direct competition with Larada.[29] Although PHS suggests it "began using FSVs prototype variations" at that point as though they were a separate company, Sheila Fassler's own declaration states that FSV was not even founded until May 4, 2017 – it was thus PHS, not FSV, that was secretly developing the FloSonix Device, as it had been since 2014.[30]

## V. The Public Interest Supports an Injunction.

PHS's brazen violation of contractual provisions it freely entered into should not be condoned. PHS's defense is simply to re-argue that there is no actual breach. While not remotely true, the existence of breach has no bearing on the public interest factors. The Larada Agreements should be enforced.[31]

Regarding the availability of lice treatments, PHS's own submissions defeat its own arguments. The AirAllé is a proven and FDA-cleared device. According to PHS, the currently available FloSonix Device can be used for "investigative purposes only."[32] PHS thus cannot represent that the FloSonix Device is safe or effective (although it states that the FloSonix is

---

[28] For a further discussion of that breach, *see* Dkt. # 86, Am. Compl. at ¶¶ 34-48.

[29] *See* Roberts Dec. ¶¶ 20-23.

[30] S. Fassler Dec. ¶ 17.

[31] *See* Mem. at 24-25.

[32] S. Fassler Dec. ¶¶ 21-23.

effective in its Response).[33] The continued expansion of the use of the FloSonix Device comes at the expense of Larada, depriving the public of a proven and FDA-cleared solution. Furthermore, the PHS website shows that PHS also sells a home kit along with in-clinic head checks and support services that do not require use of the FloSonix Device, and thus areas served by PHS will still have head lice treatment available from those clinics.[34]

### VI. No Bond Is Necessary For An Injunction To Issue Against PHS.

No bond should be required here. Injunction bonds are not required where defendant has not demonstrated a likelihood of harm. [35] PHS cannot be damaged by a requirement that it comply with its contractual obligations.[36]

Even if a bond were somehow appropriate, PHS suggests a bond should be fixed in the amount of its revenues from 2019 should be disregarded. Lost profits, not revenues, would be better measure of PHS's potential damages in the unlikely event that an injunction issues but PHS

---

[33] Resp. at 24. *See* 21 CFR 812.7 (A sponsor, investigator, or any person acting for or on behalf of a sponsor or investigator shall not: * * * (d) Represent that an investigational device is safe or effective for the purposes for which it is being investigated.)

[34] https://pediatrichairsolutions.com/services/ (last accessed May 22, 2020).

[35] *See Winnebago Tribe of Nebraska v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003)(no bond required where there is "an absence of proof showing a likelihood of harm.");

[36] *Rex Med. L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) ("being forced to comply with contractual obligations that a party voluntarily entered into is simply not the sort of "damage" that is compensable at law" and setting bond at fraction of requested amount where the chance of adverse ruling was considered less than 5%); *Edelman Fin. Engines, LLC v. Harpsoe*, No. 19-2026-DDC-GEB, 2020 WL 1503476, at *5 (D. Kan. Mar. 30, 2020)(holding that defendant was not damaged by having to comply with contractual obligations, even where TRO was wrongfully issued for lack of subject matter jurisdiction).

prevails at trial. However, the investigative status of the FloSonix Device prevents PHS from realizing any profit on its sale.[37] Accordingly, no bond should be required if PHS is enjoined from those activities.

Moreover, PHS's own submissions state that it was closed from mid-March until May 4, and that currently only one PHS clinic is allowing one family in at a time.[38] PHS's 2019 profit/loss statement is thus an inappropriate basis for any assessment of lost profits in 2020. In the absence of evidence that would raise PHS's 2020 profits *attributable to FloSonix* above the speculative level, no bond is appropriate for this reason as well.

To the extent the injunction prohibits PHS from selling or marketing the FloSonix Device to others, PHS has not provided any evidence of harm, and the asserted investigational nature of the FloSonix Device again precludes any potential profit.

## **CONCLUSION**

For the foregoing reasons and those in Larada's Motion, Larada respectfully requests that this Court grant its motion for preliminary injunction and enjoin PHS from selling, using, marketing, or manufacturing the FloSonix Device, or otherwise using Larada's confidential information.

DATED this 22nd day of May, 2020

/s/ Peter Stasiewicz
Douglas C. Smith
LEWIS BRISBOIS BISGAARD & SMITH LLP

Peter Stasiewicz (*pro hac vice*)
ARCTURUS LAW FIRM

*Attorneys for Plaintiff Larada Sciences, Inc.*

---

[37] *See* 21 CFR 812.7(b).

[38] S. Fassler Dec. ¶ 24.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct of copy of the foregoing **REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was served to the following this 22nd day of May, 2020, in the manner set forth below:

[X]   Through the CM/ECF System for the U.S. District Court
[ ]   Hand Delivery
[ ]   U.S. Mail, postage prepaid
[ ]   E-mail: greenwood@mcgiplaw.com
      biehn@mcgiplaw.com
      andrew.strickland@leehayes.com
      sarah.elsden@leehayes.com

Christine T. Greenwood
Geoffrey K. Biehn
MAGLEBY CATAXINOS & GREENWOOD, PC
170 South Main Street, Suite 1100
Salt Lake City, UT 84101-3605
greenwood@mcgiplaw.com
biehn@mcgiplaw.com

Andrew G. Strickland
Bill Dyer
LEE & HAYES, PLLC
1175 Peachtree Street, NE
100 Colony Square, Suite 2000
Atlanta, GA 30361
(admitted pro hac vice)
andrew.strickland@leehayes.com
bill.dyer@leehayes.com

Sarah E. Elsden
LEE & HAYES, PLLC
601 W. Riverside Avenue, Suite 1400
Spokane, WA 99201
(admitted pro hac vice)
sarah.elsden@leehayes.com

                                                    /s/ Peter M. Stasiewicz