IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LARADA SCIENCES, INC., a Delaware corporation,<br><br>          Plaintiff/Counter-defendant,<br><br>v.<br><br>PEDIATRIC HAIR SOLUTIONS CORPORATION, a North Carolina corporation; JOHN E. FASSLER, M.D.; and SHEILA M. FASSLER,<br><br>          Defendants/Counterclaimants. | **MEMORANDUM DECISION AND ORDER GRANTING LARADA'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**<br><br>Case No. 2:18-cv-00551-RJS-JCB<br><br>Chief Judge Robert J. Shelby<br><br>Magistrate Judge Jared C. Bennett |

This case arises from the breakdown of a business relationship between Plaintiff Larada Sciences, Inc., and Defendants Pediatric Hair Solutions Corporation, John E. Fassler, M.D., and Sheila M. Fassler.  Both Larada and Pediatric Hair center their businesses around the treatment of head lice using heated-air devices.  Among other things, Larada claims Defendants breached multiple agreements between the parties, stole Larada's personal and intellectual property, and illegally used Larada's confidential and proprietary information to create a competing lice treatment device.

Before the court is Larada's Motion for Leave to File Second Amended Complaint,[1] in which it seeks to plead additional factual allegations to add FloSonix Ventures, LLC as a defendant in the case.  FloSonix Ventures was founded by Sheila Fassler shortly after Pediatric Hair and Larada severed ties in order to develop a new lice treatment device and bring it to market.  The company was previously dismissed from this case after the court concluded it lacked sufficient minimum contacts with Utah to subject it to personal jurisdiction in this forum.[2]

---

[1] Dkt. 160.

[2] *See generally* Memorandum Decision and Order Granting FloSonix Ventures' Motion to Dismiss (Dkt. 126).

As explained below, Larada's proposed amendments appear to resolve the jurisdictional defects present in the First Amended Complaint because Larada has sufficiently alleged new facts tending to show that FloSonix Ventures acted as an alter ego of the other Defendants, allowing imputation of their contacts to FloSonix Ventures for purposes of this lawsuit. Therefore, Larada's Motion for Leave to Amend is GRANTED.

## FACTUAL BACKGROUND[3]

Larada is a Delaware corporation with its headquarters and principal place of business in Murray, Utah.[4]  It manufactures and markets devices used to treat head lice "through a patented method of applying heated air to the scalp" (Larada Devices).[5]  When the technology used in the Larada Devices was initially developed, it "was the only FDA-cleared and effective hot-air product for head lice treatment on the market."[6]  As part of its business, the company grants licenses to independent head-lice treatment clinics allowing them to use Larada's Devices pursuant to licensing or lease agreements.[7]

Pediatric Hair is based in North Carolina and incorporated under North Carolina law.[8] The company specializes in the clinical treatment of head lice, operating clinics in North and South Carolina.[9]  Pediatric Hair previously operated its clinics under a series of licensing agreements with Larada.[10]  John and Sheila Fassler are the co-founders and owners of Pediatric

---

[3] The Factual Background is drawn from the currently operative pleading, Larada's First Amended Complaint (Dkt. 86).  The new facts alleged in the Proposed Second Amended Complaint are presented below in Section I of the Analysis.

[4] Dkt. 86 ¶ 1.

[5] *Id.* ¶ 15.

[6] *Id.* ¶¶ 15, 17.

[7] *Id.* ¶ 17.

[8] *Id.* ¶ 2.

[9] *Id.* ¶¶19–22.

[10] *Id.*

Hair, and Sheila serves as its president.[11]  John is a medical doctor and Sheila is a registered nurse.[12]  The Fasslers are both North Carolina citizens.[13]

On or about November 16, 2010, Larada entered into a lease agreement with Pediatric Hair (2010 Agreement).[14]  The 2010 Agreement provided that Pediatric Hair would be "made aware of [Larada's] confidential or proprietary information or trade secrets."[15]  Moreover, Pediatric Hair "agree[d] to maintain in strict confidence and not to use or disclose the Confidential Information," and "agree[d] not to attempt to discover any Confidential Information by reverse engineering, decompiling or [] any other unauthorized manner."[16]  Under that same provision, both parties agreed that the obligations concerning the disclosure of confidential information "shall survive any expiration or termination of [the 2010] Agreement."[17]  Although Sheila Fassler executed the 2010 Agreement on behalf of Pediatric Hair, she also subjected herself to a personal guaranty, agreeing to "full performance and payment of all obligations . . . including, without limitation, the covenants not to compete, or disclose confidential trade information and agree[ing] to be personally bound thereby."[18]

The 2010 Agreement had an initial term of two years, after which Larada and Pediatric Hair entered into a "rental agreement" on January 23, 2013 (2013 Agreement).[19]  The 2013 Agreement granted Pediatric Hair the exclusive use of Larada's Devices in North Carolina and

---

[11] *Id.* ¶¶ 19, 24, 29.  Since the two individual defendants share the same surname, the court will at times refer to them by their first names, with no disrespect intended by the informality.

[12] *Id.* ¶ 5; *see* Declaration of Sheila Fassler (Dkt. 119) at 1.

[13] Dkt. 86 ¶¶ 4–5.

[14] *Id.* ¶ 19.

[15] *Id.* ¶ 20.

[16] *Id.*

[17] *Id.*

[18] *Id.* ¶ 19.

[19] *Id.* ¶ 21.

South Carolina.[20]  It also restricted Pediatric Hair's use of Larada's confidential or proprietary information, similar to the 2010 Agreement.[21]

On August 31, 2015, Larada and Pediatric Hair entered into a series of license agreements allowing Pediatric Hair to use Larada's Devices in Georgia, South Carolina, North Carolina, and Ohio (2015 Agreements).[22]  These agreements obligated Pediatric Hair to pay a nonrefundable license payment upfront, a refundable deposit for each device, and a use fee for each treatment where a Larada Device was used.[23]  Each of the 2015 Agreements provided: "During the Term of this Agreement and following its expiration or termination for any reason, [Pediatric Hair] agrees that without [Larada's] prior written consent, . . . it shall not . . . disassemble, reverse-engineer, or otherwise replicate, duplicate or copy any component or portion of the Device . . . ."[24]  Pediatric Hair also agreed to "[r]efrain from using any component of the Proprietary Information in any business or in any manner not specifically authorized or approved by [Larada] in writing," and to "[e]xercise the highest degree of diligence and make every effort to maintain the absolute confidentiality of all such Prop[rietary] Information during and after the Term of this Agreement."[25]

Finally, the 2015 Agreements provided that, upon termination "by either party," Pediatric Hair was to "(i) immediately pay all amounts then due to [Larada] in accordance with the terms of th[e] Agreement[s]; (ii) within five (5) business days . . . , surrender and return to [Larada] all Devices and all unused consumables; (iii) remove any signage or indication that [Pediatric Hair]

---

[20] *Id.*

[21] *Id.*

[22] *Id.* ¶ 22.

[23] *Id.* ¶ 23(5)(a).

[24] *Id.* ¶ 23(10)(b).

[25] *Id.* ¶ 23(10)(j).

has the right to offer Treatments using the Device or that contain the Marks; and, (iv) take such other commercially reasonable steps as may be necessary to dissociate . . . from [Larada]."[26]

Starting in 2014, and before entering the 2015 Agreements, the Fasslers began to take a more active role in Larada's nascent Lice Clinics of America Network (LCA Network).[27]  The LCA Network is a group of clinics that use Larada's Devices in their practices while generally operating under their own names.[28]  At Sheila's request, she was appointed in late 2014 to the LCA Network Affiliate Advisory Board, which is comprised of seven representatives from affiliate clinics across the country.[29]  In August 2015, Larada entered into an agreement with John Fassler, retaining him as National Medical Director for the LCA Network.[30]  At the first Affiliate Advisory Board meeting in January 2015, Sheila was presented with sensitive and proprietary information from Larada's upper management, including new products in development; updated LCA branding; potential changes to treatment, pricing, and incentives for Larada affiliates; and Larada's marketing strategies.[31]

Meanwhile, unbeknownst to Larada, the Fasslers allegedly devised a plan to use Larada's Device to create their own competing device.[32]  Sometime in November 2016, Larada sent a "beta version of its second-generation device" to Pediatric Hair.[33]  Larada claims Pediatric Hair and the Fasslers in turn sent this second-generation device to another firm sometime in late 2016 for the purpose of "reverse engineering" Larada's invention to create their own.[34]

---

[26] *Id.* ¶ 23(13)(c).

[27] *Id.* ¶¶ 24–31.

[28] *Id.* ¶ 25.

[29] *Id.* ¶ 29.

[30] *Id.* ¶ 24.

[31] *Id.* ¶ 30.

[32] *Id.* ¶ 32.

[33] *Id.* ¶ 33.

[34] *Id.* ¶¶ 32, 40, 51.

By the end of 2016, Pediatric Hair stopped making royalty payments required under the 2015 Agreements.[35]  On February 1, 2017, Sheila Fassler sent an email to Larada's Chief Executive Officer acknowledging that Pediatric Hair had not made the royalty payments "in a timely fashion," but she stated the reason was Pediatric Hair had been "trying to get a loan," and had been advised to "keep [its] revolving debt low and [its] cash flow high."[36]

A meeting was held on February 10, 2017, in Park City, Utah, at which the Fasslers demanded that Larada retroactively reduce its per-treatment use fee.[37]  According to Larada, John Fassler stated that the use fees were unjustifiable because the technology used in Larada Devices was little more than "heated air" and could not be patented because it relied on a "law of nature."[38]  John also threatened that Pediatric Hair would go into direct competition with Larada if Larada did not acquiesce to the demands.[39]

On February 12, Larada's CEO informed Pediatric Hair that its continued refusal to pay could result in late fees and interest, per the 2015 Agreements.[40]  She also reiterated Larada's right to terminate the 2015 Agreements if the payments were not made.[41]  On February 17, Pediatric Hair's counsel sent a letter reiterating the Fasslers' demand to change the fee structure and apply it retroactively to January 1, 2017.[42]  Additional communications were exchanged in the weeks that followed, but neither party acceded to the other's demands.[43]

---

[35] *Id.* ¶ 34.

[36] *Id.* ¶ 36.

[37] *Id.* ¶ 38.

[38] *Id.* ¶ 37.

[39] *Id.* ¶ 39.

[40] *Id.* ¶ 41.

[41] *Id.*

[42] *Id.* ¶ 42.

[43] *Id.* ¶¶ 43–46.

Accordingly, on March 10, 2017, Larada gave written notice that it was terminating the 2015 Agreements based on Pediatric Hair's payment defaults.[44]  This letter instructed Pediatric Hair to: "(i) immediately pay all amounts currently due to Larada; (ii) within five (5) business days of receipt of this letter, surrender and return to Larada . . . all Devices and all unused Consumables; (iii) remove any signage or indication that [Pediatric Hair] ha[s] the right to offer Treatments using the Device, including . . . any of Larada's Marks, including photos and videos, on your website and any other social media pages; (iv) destroy any hard copies and digital copies of marketing materials that use Larada's Marks; and (v) take such other steps necessary to disassociate yourself from Larada."[45]  Pediatric Hair did not accede to any of these demands, continued to use Larada Devices through April 2017, and never paid Larada the amounts owed for using Larada Devices from January to April 2017.[46]

Shortly after receiving the March termination letter, Pediatric Hair began returning the first-generation devices, with the last being returned to Larada on May 17, 2017.[47]  However, Larada claims Pediatric Hair never returned the second-generation prototype device it received in November 2016, contending the prototype was destroyed in the reverse-engineering process.[48]

Meanwhile, on May 4, 2017, the Fasslers formed a new company called FloSonix Ventures, which they registered as a Wyoming limited liability company (LLC).[49]  In July 2017, Larada learned Pediatric Hair had, since at least May 2017, been giving treatments in its clinics using a new device called FloSonix (FloSonix Device), which had "striking" similarities to

---

[44] *Id.* ¶ 46.

[45] *Id.* ¶ 47.

[46] *Id.* ¶¶ 48–50.

[47] *Id.* ¶ 51.

[48] *Id.* ¶ 51.

[49] *Id.* ¶¶ 3, 58; Dkt. 119 ¶ 2.

Larada's Devices.[50]  Larada alleges FloSonix Ventures was founded "for the express purpose" of using Larada's trade secrets to develop the FloSonix Device, bring it to market, and compete with Larada.[51]  According to Larada, Defendants would not have been able to accomplish these things in such a short timeframe without reverse-engineering Larada Devices.[52]

Through these actions, Larada contends Defendants "disclosed the Larada Device to third parties, disassembled, reverse-engineered, or otherwise replicated, duplicated, or copied the Device to create a competing product called the FloSonix Device, in violation of Section 10 of the [2015] Agreements . . . and Section 10.1 of the [2010] Agreement."[53]  Larada also contends Pediatric Hair has failed to disassociate itself from Larada by declining to remove references to Larada from its online marketing materials and websites, including marks, devices, and other intellectual property.[54]  Finally, Larada claims "Defendants continue to use sales and marketing materials related to Larada's Devices to promote the FloSonix Device and develop a competing network of clinics."[55]

## PROCEDURAL HISTORY

Larada initiated this action on July 11, 2018, originally bringing six causes of action and naming Pediatric Hair as the only defendant.[56]  Pediatric Hair answered and counterclaimed on September 21, 2018,[57] and later filed an Amended Answer and Counterclaims on February 20,

---

[50] Dkt. 86 ¶¶ 53–54, 57.

[51] *Id.* ¶ 59.

[52] *Id.* ¶ 57.

[53] *Id.* ¶ 60.

[54] *Id.* ¶ 52.

[55] *Id.* ¶ 65.

[56] *See generally* Dkt 2. (Original Complaint).

[57] Pediatric Hair's Answer, Affirmative Defenses, and Counterclaims (Dkt. 24).

2019.[58]  Upon Motion from Larada, some of Pediatric Hair's Counterclaims were dismissed.[59]

Pediatric Hair then filed a Motion to Amend its Counterclaims on April 24, 2019.[60]  The case

was thereafter stayed from May 2019 to March 2020 to allow the parties to conduct settlement

negotiations.[61]  These efforts were ultimately unsuccessful, and the stay was lifted.[62]

        Larada filed its First Amended Complaint (FAC) on May 7, 2020, asserting nine causes

of action and naming Pediatric Hair, FloSonix Ventures, LLC, Sheila Fassler, and John Fassler

as defendants.[63]  On July 13, FloSonix Ventures filed a Motion to Dismiss,[64] arguing—among

other things—that the court did not have personal jurisdiction over it.[65]

        The court issued a Memorandum Decision and Order granting the Motion to Dismiss on

September 9, 2020, dismissing Larada's claims against FloSonix Ventures for lack of personal

jurisdiction.[66]  The court concluded Larada had failed to establish that any of FloSonix Ventures'

alleged actions had been expressly aimed at Utah.[67]  Specifically, according to the allegations in

the FAC:

> FloSonix [Ventures] maintains no business presence in Utah.  It does not have any
> employees in Utah.  Nor has it marketed the FloSonix Device to or conducted
> commercial transactions with anyone in Utah.  FloSonix [Ventures] has never had
> any contractual relationship with Larada.  Nor is [the company's] receipt of
> Larada's trade secrets alleged to have occurred in Utah.[68]

---

[58] Pediatric Hair's Amended Answer, Affirmative Defenses, and Counterclaims (Dkt. 42).

[59] *See* Motion to Dismiss Counterclaims (Dkt. 31); Minute Order Following Proceedings on 4/2/19 (Dkt. 45).

[60] Dkt. 48.

[61] *See* Order Granting Stipulated Motion to Stay (Dkt. 52); Order Granting Stipulated Motion to Lift Stay (Dkt. 66).

[62] *See* Dkt. 66.

[63] *See generally* Dkt. 86.

[64] Dkt. 118.

[65] *Id.* at 6–12.

[66] Memorandum Decision and Order Granting Motion to Dismiss (Dkt. 126).

[67] *Id.* at 7.

[68] *Id.*

The court also found that, based on the facts as pleaded in the FAC, the other Defendants' "contacts with Utah are alone insufficient to establish purposeful direction on the part of FloSonix [Ventures]—as is required under the 'expressly aimed' test."[69]  Further, FloSonix Ventures was "not alleged to have directed [Pediatric Hair] or the Fasslers to acquire Larada's trade secrets for its own benefit" and, moreover, "FloSonix did not yet exist at the time" the secrets were acquired.[70]  For these reasons, the court concluded it lacked personal jurisdiction over FloSonix Ventures.[71]

On October 29, 2021, the remaining Defendants filed a Motion for Judgment on the Pleadings, seeking to dismiss three of Larada's claims.[72]  Then, on December 10, Larada filed a Motion for Leave to File Second Amended Complaint under Federal Rules of Civil Procedure 15(a)(2), 16, and 21, seeking to plead additional facts it claims will support the court's personal jurisdiction over the dismissed party, FloSonix Ventures.[73]

After Defendants' Motion for Judgment on the Pleadings and Larada's Motion to Amend were fully briefed, the court heard oral argument on both motions on August 16, 2022.[74]  Following the hearing, the court ordered supplemental briefing on the Motion to Amend and took the Motion for Judgement on the Pleadings under advisement.[75]  On September 22, the court issued an oral ruling granting in part and denying in part Defendants' Motion for Judgment on the Pleadings, dismissing without prejudice only Larada's trespass to chattels claim.[76]

---

[69] *Id.* at 10–11 (citing *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1077 (10th Cir. 2008)).

[70] *Id.* at 10.

[71] *Id.* at 10–11.

[72] Dkt. 154.

[73] Dkt. 160.

[74] Minute Entry for 8/16/22 Hearing (Dkt. 178).

[75] *See id.*; Docket Text Order Ordering Supplemental Briefing (Dkt. 177).

[76] Minute Order for Sept. 22, 2022 Oral Ruling (Dkt. 184).

As to the supplemental briefing on Larada's Motion to Amend, the court ordered the parties to address two discrete issues: "(1) under the applicable law, whether an alter ego theory can be utilized as a basis to assert the court's personal jurisdiction over a party which does not otherwise have the requisite minimum contacts with Utah; and (2) the futility of Plaintiffs' proposed amendments concerning its alter ego claim as related to the previously dismissed party, FloSonix Ventures, LLC."[77]   Having received and considered the parties' supplemental briefing, the Motion to Amend is ripe for decision.

## LEGAL STANDARDS

"Federal Rules of Civil Procedure 15(a)(2) and 16(b)(4) govern where, as here, a party seeks leave to amend pleadings after the deadline for amending set in a scheduling order has passed."[78]   In the Tenth Circuit, courts apply "a two-step analysis based on both Rule 16(b) and Rule 15(a) when deciding a motion to amend that is filed beyond the scheduling order deadline."[79]

Under the first step, the court must determine "whether the moving party has established 'good cause' within the meaning of Rule 16(b)(4) so as to justify allowing the untimely motion."[80]   This is because Rule 16(b)(4) directs that a court-issued scheduling order "may be modified only for good cause and with the judge's consent."[81]   "Good cause" under Rule 16 is a

---

[77] Dkt. 177.

[78] *C.R. Bard, Inc. v. Med. Components, Inc.*, No. 2:12-cv-00032-RJS-DAO, 2021 WL 1842539, at *2 (D. Utah May 7, 2021) (citing *Bylin v. Billings*, 568 F.3d 1224, 1231 (10th Cir. 2009)); *see also Bylin*, 568 F.3d at 1231 ("Rule 15 governs amendments to pleadings generally, Rule 16 governs amendments to scheduling orders.").

[79] *StorageCraft Tech. Corp. v. Persistent Telecom Sols., Inc.*, No. 2:14-CV-76-DAK, 2016 WL 3435189, at *8 (D. Utah June 17, 2016); *see also Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (explaining that a party seeking leave to amend after a scheduling order deadline must satisfy both Rule 16(b) and Rule 15(a)).

[80] *StorageCraft*, 2016 WL 3435189, at *8.; *see also Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1241 (10th Cir. 2014) (adopting the position that "parties seeking to amend their complaints after a scheduling order deadline must establish good cause for doing so").

[81] Fed. R. Civ. P. 16(b)(4).

"more stringent standard than the standards for amending a pleading under Rule 15."[82]  It "requires diligence," meaning the party moving for amendment "cannot establish good cause if [it] knew of the underlying conduct but simply failed to raise its claims."[83]  District courts are "afforded wide discretion" in determining whether the movant has shown good cause.[84]

Second, if the court determines good cause has been established, it will then "proceed to determine if the more liberal Rule 15(a) standard for amendment has been satisfied."[85]  This standard provides that the "court should freely give leave [to amend] when justice so requires."[86]  Under Rule 15, "[r]efusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."[87]  As recognized by the Tenth Circuit, "the purpose of [Rule 15] is to provide litigants the maximum opportunity for each claim to be decided on the merits rather than on procedural niceties."[88]

Additionally, since Larada is seeking to add a party to the case, Rule 21 is implicated.[89]  That rule allows the court to "at any time, on just terms, add or drop a party."[90]  The Tenth Circuit has recognized that "the same basic standard for adding or dropping a party" applies under either Rule 21 or Rule 15(a).[91]  Accordingly, since Larada brings its Motion under both

---

[82] *Bylin*, 568 F.3d at 1231.

[83] *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1020 (10th Cir. 2018) (quotation simplified).

[84] *Bylin*, 568 F.3d at 1231.

[85] *StorageCraft*, 2016 WL 3435189, at *8.

[86] Fed. R. Civ. P. 15(a)(2).

[87] *Bylin*, 568 F.3d at 1229 (quotation simplified).

[88] *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quotation simplified).

[89] *See Mindock v. DuMars*, No. 20-1236, 2022 WL 1410017, at *3 n.2 (10th Cir. May 4, 2022).

[90] Fed. R. Civ. P. 21.

[91] *Mindock*, 2022 WL 1410017, at *3 n.2 (quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1474 (3d ed. 2021)); *accord United States ex rel. Precision Co. v. Koch Indus., Inc.*, 31 F.3d 1015, 1018 n.5 (10th Cir. 1994) ("[W]here the parties have sought leave of court, there is no conflict between Rule 15(a) and Rule 21.").

Rule 15 and Rule 21,[92] and to avoid repetition, the court's analysis below on the pertinent Rule 15 factors incorporates the relevant considerations under Rule 21 as well.

## ANALYSIS

In addressing the merits of Larada's Motion to Amend, the court begins with an overview of the relevant amendments Larada seeks to make to the operative pleading. The court then turns to Defendants' argument that Larada's Motion should be viewed as a motion to reconsider. After finding that argument unavailing, the court analyzes Larada's ability to meet the combined Rule 16-15 standard to allow amendment at this stage of the litigation. As explained below, the court concludes Larada has satisfied its burden, and should be given leave to amend.

**I. New Allegations in the Proposed Second Amended Complaint**

In its Proposed Second Amended Complaint (PSAC),[93] Larada makes numerous changes and additions to the operative pleading.[94] First, there are several new allegations designed to show unity of operations between FloSonix Ventures and the other Defendants:

- The court purportedly has personal jurisdiction over FloSonix Ventures because it is an "alter ego of the Fasslers and [Pediatric Hair], is operated as a single enterprise with [Pediatric Hair], and [under] the doctrine of veil piercing or reverse veil piercing."[95]

- Sheila Fassler is president of both Pediatric Hair and FloSonix Ventures, and neither company has any other officers on file with the respective state agencies.[96]

- Sheila Fassler "owns 100%" of both entities.[97]

- The Fasslers are the only individuals with authority to sign checks on behalf of Pediatric Hair, and Sheila is the only person who may sign on behalf of FloSonix Ventures.[98]

---

[92] Larada asserts amendment is proper under Federal Rules of Civil Procedure 15(a)(2), 16, and 21. Dkt. 160 at 1.

[93] Dkt. 160-1.

[94] *See* Dkt. 160-2 (Redlined Proposed Second Amended Complaint).

[95] Dkt. 160-1 ¶ 12.

[96] *Id.* ¶¶ 63–65.

[97] *Id.* ¶¶ 61–62.

[98] *Id.* ¶¶ 66–67.

- FloSonix Ventures "claims to share two employees with [Pediatric Hair], but [FloSonix Ventures] has no payroll of its own."[99]

- Both companies "shared the same phone number until at least 2019."[100]

- Both companies operate out of the same office building, listing the same street address on official documents (6923 Shannon Willow Road, Charlotte, NC). Whereas Pediatric Hair "currently claims its address to be Suite 100 in that building; [FloSonix Ventures] claims to operate out of Suite 200." However, FloSonix Ventures "was listing its principal place of business as 6923 Shannon Willow Drive, Suite 100, in documents including leases as recently as 2020."[101]

- Sheila Fassler "uses multiple email accounts, variously referencing FloSonix [Ventures] and [Pediatric Hair], to conduct development of the FloSonix [D]evice."[102]

- Pediatric Hair's Chief Operating Officer "regularly, and possibly exclusively, conducts business related to the development of the FloSonix [D]evice from her [Pediatric Hair] email account."[103]

- "Although the initial FloSonix [D]evices were not only designed but built prior to the existence of [FloSonix Ventures], there is no written evidence of the ownership of the FloSonix Device being transferred to [FloSonix Ventures]."[104]

- There is apparently an agreement under which FloSonix Ventures allows Pediatric Hair to use FloSonix Devices in its clinics, but it "is an oral agreement entered into only by Sheila Fassler on behalf of both companies. There is no written agreement."[105]

- At some point, "John Fassler provided [FloSonix Ventures] with a loan of around $100,000, but like the agreement . . . for the use of the FloSonix device, there is no written loan agreement."[106]

- According to John, "[m]oney is transferred between the Fasslers, [Pediatric Hair], and FloSonix [Ventures] all the time." For instance, each company regularly pays obligations on behalf of the other, and reimburses for expenses incurred by the other relating to the FloSonix Devices.[107]

---

[99] *Id.* ¶ 65.

[100] *Id.* ¶ 75.

[101] *Id.* ¶ 74.

[102] *Id.* ¶ 87.

[103] *Id.* ¶ 86.

[104] *Id.* ¶ 78.

[105] *Id.* ¶ 79.

[106] *Id.* ¶ 81.

[107] *Id.* ¶¶ 82–84.

- "Design firms working on . . . the FloSonix [D]evice routinely refer to [Pediatric Hair] as the client, even though [FloSonix Ventures] ostensibly owns the FloSonix [D]evice."[108]

In addition, Larada adds context connecting FloSonix Ventures' activities in designing

the FloSonix Device to Pediatric Hair wrongfully retaining the Larada Devices:

- Not only did Pediatric Hair fail to return the second-generation prototype, it also "failed to return at least two first-generation units" as well.[109]

- It was all three of these devices that were disassembled and reverse-engineered to create the FloSonix Device. "The original FloSonix Device used parts directly cast from a mold taken of parts of Larada's Devices so that [Pediatric Hair] could directly use Larada's Consumables with its new FloSonix Device."[110]

In the same vein, Larada also proposes several pronoun changes to plead that FloSonix Ventures

was involved in some of the conduct previously attributed to the other Defendants:

- FloSonix Ventures was culpable along with the other Defendants in disclosing Larada's intellectual property to third parties, reverse engineering the Larada Devices, and working to create the competing FloSonix Device.[111]

- All Defendants—not just Pediatric Hair—failed to inform Larada that they had made innovations based on Larada Devices and failed to protect Larada's ownership rights over said innovations.[112]

- All Defendants—not just Pediatric Hair—have been profiting from the use of FloSonix Devices in Pediatric Hair's clinics.[113]

Finally, Larada's proposed amendments name FloSonix Ventures in four of its nine[114]

causes of action: (1) breach of contract; (2) conversion; (3) unjust enrichment; and (4)

misappropriation of trade secrets under 18 U.S.C. § 1836.[115]  The breach of contract claim is

---

[108] *Id.* ¶ 85.

[109] *Id.* ¶ 51.

[110] *Id.* ¶¶ 51, 55.

[111] *See id.* ¶ 89.

[112] *See id.* ¶ 90.

[113] *See id.* ¶ 91.

[114] The FAC and PSAC state ten causes of action, but since Larada's trespass to chattels claim was dismissed without prejudice after the instant Motion to Amend was filed, *see* Dkt. 184, and the allegations relating to that claim are unchanged in the PSAC, a total of nine claims remain.

[115] Dkt. 160-1 at p. 19–20, 24–25, 27–28.

asserted against only Pediatric Hair and FloSonix Ventures, whereas the other three claims are asserted "against all Defendants."[116]  For the most part, the paragraphs supporting each claim remain unchanged in the PSAC, except for those relating to Larada's misappropriation of trade secrets claim.  For that claim, Larada proposes amending several paragraphs to plead FloSonix Ventures' culpability with greater specificity.[117]  Namely, that:

- FloSonix Ventures, along with the other Defendants, "knew that Larada was providing them with trade secrets pursuant to confidentiality agreements."[118]

- FloSonix Ventures, along with the other Defendants, "misappropriated Larada's trade secrets by using them to help create the FloSonix Device, quickly bring the FloSonix Device to market, develop[ing] a lease arrangement of their own to create a competing network of clinics, and directly soliciting existing Larada licensees and potential Larada licensees to join that network."[119]

- All Defendants "knew or should have known . . . Larada's trade secrets were acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret[s], or derived from or through a person who owed such a duty, in that the secrets were obtained by [Pediatric Hair] and the Fasslers while they were all bound by their contractual confidentially obligations and their duties of loyalty to Larada."[120]

## II.   Larada's Motion is Properly Considered as a Motion to Amend

In opposing Larada's Motion, Defendants first contend that instead of a motion to amend the operative complaint, it is really a cleverly disguised motion to reconsider the court's prior Order Granting FloSonix Ventures' Motion to Dismiss, since Larada is in essence asking the court "to consider new evidence to reach a different conclusion than it had previously" on personal jurisdiction over FloSonix Ventures.[121]  As a result, according to Defendants, Larada

---

[116] *Id.*

[117] *See id.* ¶¶ 170–74.

[118] *Id.* ¶ 170.

[119] *Id.* ¶ 171.

[120] *Id.* ¶ 174.

[121] Opposition to Larada's Motion for Leave to File Second Amended Complaint (Dkt. 162) at 5 (quoting *George v. Beaver Cnty.*, No. 2:16-CV-1076 TS-CMR, 2020 U.S. Dist. LEXIS 108094, *4 (D. Utah June 19, 2020)).

cannot meet its burden since it does not address the appropriate standards for a motion for reconsideration.[122]  However, because the court concludes Larada's Motion asks for different relief than that sought by a motion to reconsider, the court will construe it as it is captioned: a Motion for Leave to File Second Amended Complaint.

"[A] motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law."[123]  "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[124]  According to Defendants, Larada's Motion falls into the second category.[125]  Defendants point to Larada's assertion in its Motion that it "learned additional facts" through discovery that "provide new rationales for exerting personal jurisdiction over [FloSonix Ventures]," and that Larada brought its Motion "to place these facts before the court."[126]

In Reply, Larada counters that it is not arguing there are new facts relating to the theory it advanced in responding to the Motion to Dismiss, which would merit reconsideration of that ruling.[127]  Rather, it asserts there are new facts that establish personal jurisdiction under an entirely new legal theory.[128]  And therefore it seeks amendment to plead the previously unknown facts to both place the new facts before the court and properly establish its new theory of jurisdiction over FloSonix Ventures without being constrained by the facts as pled in the FAC.

---

[122] *See id.* at 5–8.

[123] *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[124] *Id.*

[125] Dkt. 162 at 5.

[126] *Id.* (quoting Dkt. 160 at 3).

[127] Reply in Support of Motion for Leave to File Second Amended Complaint (Dkt. 165) at 2.

[128] *Id.*

In reviewing the proposed amendments, they are not so limited in scope that Larada is merely asking the court "to consider new evidence to reach a different conclusion than it had previously" regarding personal jurisdiction over FloSonix Ventures.[129]  Although the bulk of Larada's changes focus on pleading facts tending to show the general unity in operations between FloSonix Ventures and the other Defendants to establish a new theory of personal jurisdiction, it also makes several changes about FloSonix Ventures regarding conduct that forms the basis of specific legal claims.

Thus, not only are there distinctions in the personal jurisdiction theories Larada cites in the instant Motion compared to how it defended against the Motion to Dismiss, the subject matter of the amendments is broader in scope as well.  For these reasons, the court declines Defendants' invitation to construe Larada's Motion as a motion to reconsider and will instead proceed by addressing the Motion under the Tenth Circuit's combined Rule 16-15 standard for motions to amend filed after the scheduling order deadline.  Based on this conclusion, the court will not address Larada's alternative arguments as to why its Motion should be granted even if it is construed as a motion to reconsider.[130]

## III.   Larada has Shown Good Cause for Amendment, Satisfying Rule 16

Larada asserts there is good cause for amendment because: (1) it learned significant new facts after discovery that contradicted the Fasslers' prior sworn statements, (2) the new facts are material to resolving its claims on the merits, and (3) it moved to amend within a reasonable amount of time after learning the information.[131]  Defendants argue that Larada does not properly engage with the Rule 16 standard and for that reason the Motion must fail.[132]  However,

---

[129] *See George*, 2020 U.S. Dist. LEXIS 108094, *4.

[130] *See* Dkt. 165 at 2–3.

[131] Dkt. 160 at 6; Dkt. 165 at 7.

[132] Dkt. 162 at 8–9.

the court finds Larada did address good cause in its Motion and bolstered that argument with additional detail and authority in its Reply.  Further, Larada's arguments are compelling, meaning it has demonstrated good cause for amendment.

To establish good cause, a movant must "show the scheduling deadlines [could not] be met despite the movant's diligent efforts."[133]  In addition, the party "must provide an adequate explanation for any delay."[134]  "Rule 16's good cause requirement may be satisfied, for example, if a plaintiff learns new information through discovery or if the underlying law has changed."[135]

In its Motion, Larada contends "[g]ood cause exists" because the information it seeks to include in the PSAC "simply was not known, nor could it have been known, to Larada, until depositions of key [Pediatric Hair] and [FloSonix Ventures] personnel were completed."[136]  In Opposition, Defendants first argue that Larada did not meaningfully engage with the Tenth Circuit's combined Rule 16-15 standard, claiming the Motion did not contain a coherent Rule 16 analysis.[137]  In Reply, Larada counters that it did "cite[] Rule 16 numerous times in its motion," and points to the language quoted above regarding its good cause argument.[138]

The court agrees with Defendants that Larada did not brief a Rule 16 analysis in its Motion as clearly or completely as it could have, with its good cause argument apparently consisting of one sentence within the section that otherwise addressed undue delay under Rule

---

[133] *Gorsuch*, 771 F.3d at 1240 (quotation simplified).

[134] *Minter*, 451 F.3d at 1205 n.4; *accord Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 988 (10th Cir. 2019) ("'Good cause' also 'obligates the moving party to provide an adequate explanation for any delay.'" (quoting *Husky Ventures*, 911 F.3d at 1020)).

[135] *Gorsuch*, 771 F.3d at 1240.

[136] Dkt. 160 at 6.

[137] Dkt. 162 at 8–9.

[138] Dkt. 165 at 6.

15.[139]  However, Larada does address good cause in its Reply with some depth.[140]  Moreover, the

Tenth Circuit has recognized a "'rough similarity' between the 'undue delay' standard of Rule 15

and the 'good cause' standard of Rule 16,"[141] meaning that Larada intermingling its good cause

and undue delay arguments together in its opening brief does not necessarily constitute a failure

to address the good cause standard.  Therefore, the court will apply the "wide discretion"

afforded to it when analyzing motions brought under Rule 16,[142] and will consider the additional

clarifications Larada made to its good cause argument in its Reply.

Defendants next argue that, even if Larada adequately briefed Rule 16, it cannot show

good cause because "Larada's failure to seek jurisdictional discovery constitutes 'mere

oversight' and a poor 'strategic decision.'"[143]  Larada responds that "jurisdictional discovery is

not granted on hunches, and [the Fasslers] made misleading sworn statements regarding the

structure of and relationships between Defendants[,] which were later contradicted in depositions

during fact discovery."[144]  Specifically, Larada alleges it was not aware of the following facts

prior to the Fasslers' depositions: FloSonix Ventures and Pediatric Care "share" employees; the

two companies regularly pay obligations incurred by the other; funds are routinely moved

between the companies, and between each company and the Fasslers; the informal and unwritten

nature of the agreements governing the business relationship between the two companies; and

development of the FloSonix Device has been funded by Pediatric Hair, FloSonix Ventures, and

---

[139] *See* Dkt. 160 at 6.

[140] Dkt. 165 at 6–7.

[141] *Bylin*, 568 F.3d at 1231 (quoting *Minter*, 451 F.3d at 1205 n.4).

[142] *Id.*

[143] Dkt. 162 at 9 (quoting *McCubbin v. Weber Cnty.*, Nos. 1:15-cv-132, 1:15-cv-133, 2017 U.S. Dist. LEXIS 124761, at *6 (D. Utah Aug. 4, 2017)).

[144] Dkt. 165 at 7.

the Fasslers personally.[145]  As discussed further in the next section, all of these previously

unknown facts appear to be critical to the proposed amended allegations in the PSAC—both to

the theories supporting Larada's claims and to establishing personal jurisdiction over FloSonix

Ventures.

As to the timing of its Motion, Larada points out that the Fasslers' depositions were

completed in late October 2021, but the transcripts were not available until mid-November

2021.[146]  Larada then filed its Motion to Amend on December 10, 2021.[147]  Thus, Larada has

supplied "adequate reason[s] for the delay," and it appears to be attributable to the completion of

fact discovery in the regular course, as opposed to a lack of any "diligent efforts" by Larada.[148]

As noted, the Rule 16 good cause standard is satisfied if the "plaintiff learns new

information through discovery" that it seeks to include in the proposed amendments.[149]  Because

Larada learned considerable new relevant information from deposing the Fasslers, and moved to

amend within a reasonable amount of time following the completion of the depositions, Larada

has shown good cause for amendment under Rule 16.

## IV.    Rule 15's Lenient Standard Dictates that Leave to Amend Should be Granted

### A.    There is No Indication of Undue Delay, Prejudice, or Bad Faith

In its Motion, Larada argues there was no undue delay in seeking amendment, there is no

undue prejudice to Defendants, and the Motion was not brought in bad faith.[150]  Defendants do

not respond to any of these arguments in their briefing, focusing instead on arguing that Larada's

---

[145] Dkt. 160 at 5 (citing Dkt. 160-1 ¶¶ 66, 77, 82, 83, 84).

[146] *Id.*

[147] *See id.*

[148] *See Gorsuch*, 771 F.3d at 1240; *Tesone*, 942 F.3d at 988.

[149] *See Gorsuch*, 771 F.3d at 1240.

[150] Dkt. 160 at 4–6.

proposed amendments are futile under Rule 15.[151]  Since Defendants do not challenge Larada's

positions on lack of delay, dearth of prejudice, and absence of bad faith, and there is nothing

facially deficient with any of Larada's arguments, none of these three factors preclude

amendment under Rule 15.

      B.   <u>Because Larada has met its Prima Facie Burden of Establishing Jurisdiction over
FloSonix Ventures, Amendment Will Not be Futile</u>

Larada's ability to amend the FAC comes down largely to futility, with Defendants

arguing amendment will be futile because Larada is still unable to establish personal jurisdiction

over FloSonix Ventures.[152]  Larada, on the other hand, contends its proposed amendments are

not futile because they establish FloSonix Ventures is merely an "alter ego" of the other

Defendants, and therefore the other Defendants' contacts with Utah can be imputed to FloSonix

Ventures for purposes of personal jurisdiction.[153]  Based on the specific facts presented in the

PSAC, at this stage Larada has met its prima facie burden to establish the other Defendants'

contacts are attributable to FloSonix for purposes of personal jurisdiction.

"A proposed amendment is futile if the complaint, as amended, would be subject to

dismissal."[154]  To make this determination, courts look to whether it would be subject to

dismissal under the applicable Rule 12 standard.[155]  Here, Defendants do not oppose amendment

based on the PSAC as a whole being subject to dismissal, but rather on the basis that, despite the

new allegations, FloSonix Ventures would ultimately be dismissed for lack of personal

---

[151] *See generally* Dkt. 162; Defendants' Sur-Rebuttal to Larada's Sur-Reply Addressing Imputation of Contacts Via Alter Ego Theory (Dkt. 183).

[152] Dkt. 183 at 8–10.

[153] *See* Dkt. 160 at 6–7. *See generally* Larada's Sur-Reply to its Motion for Leave to File Second Amended Complaint (Dkt. 182).

[154] *Jefferson Cnty. Sch. Dist No. R-1. v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999).

[155] *See United States ex rel. Barrick v. Parker-Migliorini Int'l, LLC*, 878 F.3d 1224, 1230–31 (10th Cir. 2017).

jurisdiction.[156]  Accordingly, the Tenth Circuit's Rule 12(b)(2) standards inform the court's analysis.[157]

When personal jurisdiction is contested, the burden shifts to the plaintiff to prove jurisdiction exists.[158]  "Where, as in the present case, there has been no evidentiary hearing, and the motion to dismiss for lack of jurisdiction is decided on the basis of affidavits and other written material, the plaintiff need only make a prima facie showing that jurisdiction exists."[159] Any factual disputes between the well-pleaded facts in the proposed amended pleading, sworn affidavits, and other evidence "must be resolved in plaintiffs' favor."[160]  Finally, denial of leave to amend based on futility is only proper if the proposed amendment is "clearly futile."[161]  Thus, if the law is in any way "unsettled" or "unclear" on the issues purporting to make the proposed amendment futile, then amendment is appropriate.[162]

Accordingly, the forthcoming futility analysis focuses on whether the proposed amendments, assumed to be true, are sufficient to meet Larada's prima facie showing that the court has personal jurisdiction over FloSonix Ventures.  The court will first present an overview of the applicable personal jurisdiction standards, then address whether Larada has made its prima facie showing of jurisdiction over FloSonix Ventures through an alter ego theory, bearing in mind the aforementioned standards that apply to this analysis.

---

[156] *See generally* Dkt. 183.

[157] *See* Fed. R. Civ. P. 12(b)(2) (allowing a party to move for dismissal due to "lack of personal jurisdiction").

[158] *See Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) ("[W]hen the court's jurisdiction is contested, the plaintiff has the burden of proving jurisdiction exists." (citing *McNutt v. Gen. Motors*, 298 U.S. 178, 189 (1936))).

[159] *Id.*

[160] *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

[161] 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1487 (3d ed. July 2022 update) ("If a proposed amendment is not clearly futile, then denial of leave to amend is improper."), *cited with approval in Seale v. Peacock*, 32 F.4th 1011, 1029 (10th Cir. 2022).

[162] *See Seale*, 32 F.4th at 1029.

1. *Legal Standards Applicable to Exercising Personal Jurisdiction over Out-of-Forum Defendants*

Under Federal Rule of Civil Procedure 4, personal jurisdiction in the federal courts depends on the jurisdictional laws of the states in which they sit.[163]  Thus, to establish personal jurisdiction over a defendant, a plaintiff must show "first, that jurisdiction is authorized under [state] law and, second, that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."[164]  Utah's long-arm statute provides that "to ensure maximum protection to citizens of this state, [courts are] to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution."[165]  Consequently, under Utah law, the traditional two-step jurisdictional analysis effectively collapses into "a single question: [does] the defendant[] have sufficient 'minimum contacts' with the state of Utah to establish personal jurisdiction over [it]?"[166]

In explaining what will suffice as minimum contacts, "[t]he Supreme Court has distinguished between two types of personal jurisdiction: general and specific."[167]  General jurisdiction is established over defendants whose "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State."[168]  Specific jurisdiction is traced back to the seminal case of *International Shoe*, in which the Supreme Court recognized that "'some single or occasional acts of the corporate agent in a state' may sometimes be enough

---

[163] *See* Fed. R. Civ. P. 4(k)(1)(A) (providing that personal jurisdiction of a federal district court is "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located").

[164] *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

[165] Utah Code Ann. § 78B-3-201(3).

[166] *Rusakiewicz*, 556 F.3d at 1100; *accord Home-Stake Prod. Co. v. Talon Petroleum, C.A.*, 907 F.2d 1012, 1020 (10th Cir. 1990) ("Oklahoma's long-arm statute[] extends the jurisdiction of the state's courts to the limits of due process.  Accordingly, we need only inquire whether the assertion of jurisdiction over the corporate defendants was constitutionally permissible." (internal citations omitted)).

[167] *Hood v. Am. Auto Care, LLC*, 21 F.4th 1216, 1221 (10th Cir. 2021) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014)).

[168] *Daimler*, 571 U.S. at 127 (quotation simplified).

to subject the corporation to jurisdiction in that State's tribunals with respect to suits relating to that in-state activity."[169]  Establishing specific jurisdiction demands satisfying "two requirements: (1) that the defendant has 'purposefully directed its activities at residents of the forum,' and (2) that the suit 'arise[s] out of or relate[s] to those activities.'"[170]  However, even when both requirements are met, the defendant may still avoid jurisdiction by establishing that doing so would "offend traditional notions of fair play and substantial justice."[171]

In most instances, "[m]inimum contacts must be found as to each defendant over whom the court exercises jurisdiction."[172]  However, as the Tenth Circuit—and other circuits[173]—have recognized, it is consistent with due process to impute contacts from one defendant to another when certain relationships between them exist: where the defendants have an agency relationship;[174] when a successor business entity takes over assets from its predecessor;[175] and when two defendants are alter egos of one another.[176]  Imputation under such circumstances is

---

[169] *See Daimler*, 571 U.S. at 126–27 (quoting *Int'l Shoe Co. v. Washington*, 326 U. S. 310, 318 (1945)).

[170] *Hood*, 21 F.4th at 1221 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

[171] *Int'l Shoe*, 326 U. S. at 316.

[172] *Home-Stake*, 907 F.2d at 1020 (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

[173] *See generally* 4A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4 (4th ed. Apr. 2022 update).

[174] *See Daimler*, 571 U.S. at 135 n.13 ("Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction. . . . [A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there." (citations omitted)); *see also Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 458–59 (10th Cir. 1996) (adopting position of other circuits on imputation in agency relationships to hold that "[t]he actions of an independent distributor may not insulate a foreign company from specific jurisdiction," and that "in the absence of an agency relationship, the acts of a distributor are not ordinarily attributable to a foreign manufacturer for purposes of establishing general jurisdiction"); *cf. XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 847 (10th Cir. 2020) ("We do not foreclose the possibility that jurisdiction over a defendant could be based solely on activities of its agents."); *Benton v. Cameco Corp.*, 375 F.3d 1070, 1081 (10th Cir. 2004) (considering argument that subsidiary's contacts could be imputed to parent company under agency or alter ego theory but rejecting it because the plaintiff had "not alleged nor produced evidence" sufficiently establishing an agency or alter ego relationship).

[175] *See Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016, 1029 (10th Cir. 2021) ("In assessing personal jurisdiction, we have acknowledged that 'a corporation's contacts with a forum may be imputed to its successor.'" (quoting *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991))).

[176] *See Home-Stake*, 907 F.2d at 1020–21 (discussing imputation of contacts between two defendants when one entity or individual is the "alter ego" of the other); *see also Warad West, LLC v. Sorin CRM USA, Inc.*, 119 F. Supp. 3d 1294, 1298 (D. Colo. 2015) (noting the "alter ego theory of personal jurisdiction has been 'consistently acknowledged' in the federal courts" (quoting *Patin v. Thoroughbred Power Boats*, 294 F.3d 640, 653 (5th Cir. 2002))).

based on "[t]he theory . . . that, because the two corporations (or the corporation and its individual alter ego) are the *same entity*, the jurisdictional contacts of one *are* the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis."[177] Regardless of the exact relationship at issue, those attempting to assert jurisdiction through contact imputation are, at bottom, asking the court "to pierce the corporate veil."[178] When a court is deciding whether to disregard the corporate form and construe two entities as one, the court must "pay[] careful attention to the specific circumstances of each case."[179]

### 2. Larada has Satisfied its Prima Facie Jurisdictional Showing

In a shift from its response to FloSonix Ventures' earlier Motion to Dismiss, Larada no longer argues that FloSonix Ventures has the requisite minimum contacts to subject itself to specific jurisdiction in Utah courts.[180] Indeed, even considering the proposed new amendments, if the court were to perform an independent analysis on FloSonix Ventures, it is dubious Larada would be able to show that the company purposefully directed its activities at Utah.

Instead, Larada now contends that the other Defendants' contacts with Utah can be imputed to FloSonix Ventures because, as supported by the new allegations in the PSAC, FloSonix Ventures and Pediatric Hair "are alter egos of each other and the Fasslers personally, and operate essentially as a single entity."[181] Further, as Larada points out,[182] through answering

---

[177] *Patin*, 294 F.3d at 653 (emphasis in original) (citing *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 637 (8th Cir. 1975), *cited with approval in Hetronic Int'l*, 10 F.4th at 1028; *accord United States ex rel. Bibby v. Mort. Inv's. Corp.*, 987 F.3d 1340, 1355–56 (11th Cir. 2021) (citing *Patin*, 294 F.3d at 653) ("[J]urisdictional veil piercing . . . is based on the rationale that when a defendant exerts a high degree of control over an entity, the contacts created by the entity are, in reality, created by the defendant.").

[178] 4A Wright & Miller, *supra* note 173, § 1069.4; *accord Bibby*, 987 F.3d at 1354–56 (using "alter ego" and "corporate veil-piercing theory" interchangeably to affirm the rule that, when "the apparent forum contacts of one actor are really the forum contacts of another, it is consistent with due process to impute those contacts for personal jurisdiction purposes").

[179] 4A Wright & Miller, *supra* note 173, § 1069.4.

[180] *Compare generally* Larada's Response to FloSonix Ventures' Motion to Dismiss (Dkt. 122), *with* Dkt. 182.

[181] Dkt. 160 at 2; *see also* Dkt. 182 at 1–3.

[182] Dkt. 182 at 9.

and otherwise litigating the case without challenging jurisdiction, Pediatric Hair, John Fassler, and Sheila Fassler have all waived any challenge that they do not have minimum contacts with Utah for personal jurisdiction purposes.[183]  Thus, because the other Defendants have essentially conceded having sufficient contacts to support specific jurisdiction, if the court finds Larada's alter ego theory availing, then it need not undergo a traditional contacts analysis because the other Defendants' contacts are attributable to FloSonix Ventures for jurisdictional purposes.  The court therefore analyzes whether, under applicable law, the other Defendants' jurisdictional contacts may be imputed to FloSonix Ventures, without directly addressing what those contacts are.  For the reasons stated below, the court concludes that they may.

To support its alter ego theory, Larada first points to *Home-Stake Production Co. v. Talon Petroleum, C.A.*,[184] where the Tenth Circuit recognized the ability to exercise personal jurisdiction over entities that are the alter egos of another defendant:

> When one defendant completely controls another, the latter's contacts with the forum may fairly be imputed or attributed to the former. . . . The obverse of that situation is one in which the individual alleged to dominate the corporation has no contacts with the forum, but the alter ego corporation has sufficient contacts. In these cases, courts have sometimes attributed the corporation's contacts with the forum state to the individual for jurisdictional purposes. In such situations, attribution of contacts to the individual defendant merely reflects the reality that, although the contacts were ostensibly those of the corporation, the true actor was the individual.[185]

Thus, although minimum contacts must in most cases be "found as to each defendant over whom the court exercises jurisdiction," [186] *Home-Stake* supports the ability to deviate from the general

---

[183] *See* Dkt. 24; Defendants Sheila Fassler's and John Fassler's Answers and Affirmative Defenses and John Fassler's Counterclaim (Dkt. 117); *see also Am. Fid. Assur. Co. v. Bank of N.Y. Mellon*, 810 F.3d 1234, 1237 (10th Cir. 2016) ("Federal Rule of Civil Procedure 12(h)(1) provides that a party waives the defenses listed in Rule 12(b)(2)-(5), including lack of personal jurisdiction, Rule 12(b)(2), by failing to assert them in a responsive pleading or an earlier motion.").

[184] Dkt. 182 at 3 (citing 907 F.2d 1012 (10th Cir. 1990)).

[185] 907 F.2d at 1020–21 (citing *Lakota Girl Scout Council*, 519 F.2d 634; 4C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil 2d § 1069 (1987)).

[186] *Id.* at 1020 (citing *Calder*, 465 U.S. at 790).

rule and establish minimum contacts through imputing one business entity's contacts to another based on an alter ego theory.

The court is also mindful, however, of the situation rejected by *Home-Stake*, where the Tenth Circuit added a caveat that "the rationale of these cases does not support the proposition that, because the court has jurisdiction over a parent corporation or dominating individual, without more, it has jurisdiction over the alter ego corporation.  The dominated corporation does not direct and control its dominating corporate or individual alter ego."[187]

The situation at hand is distinguishable from the situation disavowed in *Home-Stake*.  For one, Pediatric Hair and FloSonix Ventures are single-member limited liability companies that are fully owned by the same individual: Sheila Fassler.[188]  Moreover, Larada does not allege that one company is "dominating" the other in a parent-subsidiary relationship, nor does it rely solely on one individual's dominance over FloSonix Ventures.  Rather, Larada alleges in the PSAC that the court "has personal jurisdiction over [FloSonix Ventures] pursuant to [the company's] existence as an alter ego of the Fasslers *and* [Pediatric Hair]" and because it "is operated as a single enterprise with [Pediatric Hair]."[189]  In other words, Larada's theory is that minimum contacts are established because both companies are effectively operated as a single entity and both are equally dominated by a single individual.  Larada's alter ego allegations thus present a scenario different than the situations addressed in *Home-Stake*.

Based on the authorities cited by the parties, and the court's own review, it appears the Tenth Circuit has not had occasion to directly address the precise scenario at hand: whether jurisdictional contacts can be imputed between two LLCs that are alleged to operate as a single

---

[187] *Id.* at 1021.

[188] *See* Dkt. 160-1 ¶¶ 61–62.

[189] *Id.* ¶ 12 (emphasis added).

entity and alter egos of a single individual.  However, there are cases from this district that have

imputed contacts in similar contexts.  For instance, in *US Magnesium, LLC v. ATI Titanium*

*LLC*[190]—a case Larada cites[191]—the court held the plaintiff had made a prima facie showing of

personal jurisdiction based on an alter ego theory.[192]  The plaintiff sued a subsidiary LLC and its

out-of-state parent corporation, and the corporation sought dismissal for lack of personal

jurisdiction.[193]  The court found these arguments unavailing, concluding the plaintiff had

sufficiently alleged that the two entities were alter egos of one another, meeting the prima facie

burden for jurisdiction.[194]  In particular, the court found telling the allegations that the LLC "did

not maintain its own, separate financial records"; "was entirely dependent on [the corporation]

for any funding"; "did not maintain its own, separate corporate records or meeting minutes"; and

its "corporate witnesses [we]re actually officers or employees" of the corporation.[195]  The court

concluded these "allegations demonstrate[d] a unity of interest and ownership such that separate

corporations no longer exist."[196]

> This overarching principle was reaffirmed in *Avtech Capital, LLC v. C & G Engines*
>
> *Corp.*,[197] another case from this district where the court cited *US Magnesium* and *Home-Stake* in
>
> recognizing the ability to impute jurisdictional contacts between a corporation "[w]hen a
>
> corporation is an alter ego of an individual."[198]  The *Avtech Capital* court was facing a challenge
>
> to the plaintiff's motion to amend its complaint to add an individual defendant as the alter ego of

---

[190] No. 2:17-cv-923-DB, 2019 U.S. Dist. LEXIS 68562 (D. Utah Apr. 19, 2019).

[191] *See* Dkt. 182 at 3.

[192] 2019 U.S. Dist. LEXIS 68562, at *11.

[193] *Id.* at *4–5, 8–9.

[194] *Id.* at *10.

[195] *Id.* at *10–11.

[196] *Id.* at *11.

[197] No. 2:19-cv-00541-JNP-DAO, 2020 U.S. Dist. LEXIS 212915 (D. Utah Nov. 13, 2020).

[198] *Id.* at *13 (citing *US Magnesium*, 2019 U.S. Dist. LEXIS 68562, at *9–12; *Home-Stake*, 907 F.2d at 1021).

a corporation and an LLC, in which the individual defendant argued the plaintiff could not establish personal jurisdiction.[199]  The court ultimately found jurisdiction over that defendant lacking because the plaintiff had not "allege[d] any facts that would support a claim that any of these business entities was a mere instrumentality of [the individual] or that he engaged in improper conduct in the formation or use of any of these business entities."[200]  Despite ruling against the plaintiff based on the lack of specific allegations, the court recognized the underlying rule that contacts may be imputed between two alter egos.[201]

Furthermore, although the Tenth Circuit has not addressed the issue, other federal courts of appeal have spoken favorably toward imputing contacts in situations like the one presented here: where two companies are alleged to operate as a single entity, and that entity is an alter ego of one or two individuals.  For instance, in *Patin v. Thoroughbred Power Boats,* the Fifth Circuit observed that "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."[202]  This is because alter egos are considered to effectively be "the same entity," such that "the jurisdictional contacts of one [become] the jurisdictional contacts of the other for the purposes of the *International Shoe* due process analysis."[203]

---

[199] *Id.* at *11–12.

[200] *Id.* at *14.

[201] *See id.* at *13–14.

[202] 294 F.3d at 653; *see also id.* at 653 n.18 (collecting cases).

[203] *Id.* (emphases removed) (citing *Lakota Girl Scout Council*, 519 F.2d at 637).

     The Federal Circuit took a similar approach in *Minnesota Mining & Manufacturing Co. (3M) v. Eco Chem, Inc.*,[204] which has factual similarities to this case.  The case arose from a patent infringement action in the District of Minnesota, where the district court entered default judgment against a defunct Minnesota corporation, and later added three out-of-state parties as defendants under Federal Rule of Civil Procedure 25(c).[205]  On appeal, the three joined defendants—a Georgia corporation and two Georgia individuals—challenged the judgment on the grounds that they were not subject to personal jurisdiction in Minnesota.[206]  The Federal Circuit rejected this argument, observing that the Georgia corporation "was merely a continuation" of the Minnesota corporation, as the successor had been the "transferee of [its predecessor's] assets, trademarks, customer lists and good-will."[207]  The court noted neither the plaintiff nor the district court had claimed that the Georgia corporation "infringed any patents," and indeed, the company "did not even exist when the significant events took place."[208]  Nevertheless, the Federal Circuit held that the district court had jurisdiction over the Georgia corporation and "could properly join [it] as a party to the case" simply because it took over assets that were the subject of the lawsuit from the predecessor corporation.[209]

     As to the individual defendants, the *3M* court held they were subject to jurisdiction because they were "alter egos" of the defunct Minnesota corporation.[210]  Citing a treatise, the court looked to whether "insistence on the corporate form would enable the stockholder to avoid

---

[204] 757 F.2d 1256 (Fed. Cir. 1985).

[205] *Id.* at 1258–59; *see* Fed. R. Civ. P. 25(c) (where "an interest is transferred," allowing "transferee to be substituted in the action or joined with the original party").

[206] 757 F.2d at 1258, 1261.

[207] *Id.* at 1262.

[208] *Id.* at 1265.

[209] *Id.* at 1264.

[210] *Id.* at 1264–65.

legal liability."[211]   Specifically, it endorsed the view that "[p]osttort activity, when conducted to strip the corporation of its assets in anticipation of impending legal liability, may be considered in making the determination whether to disregard the corporate entity."[212]   Applying these principles, the court held that "the record fully supports the conclusion[] that recognition of the separate corporate form is not required in this case."[213]   The court also relied on equitable principles, noting the district court had found the individual defendants "purposely manipulated [the corporation] so as to thwart [plaintiff's] recovery of its judgment."[214]

Although *3M* is distinguishable procedurally since it involved post-judgment joinder of alter ego parties, there is another more recent case from the Eleventh Circuit, *United States ex rel. Bibby v. Mortgage Investors Corp.*,[215] with both facts and a procedural posture more akin to this case.   In *Bibby*, two relators brought a qui tam action against a mortgage broker corporation to recover money the federal government paid on veterans' behalf.[216]   The relators later amended their complaint to add an individual defendant who was the corporation's majority shareholder and chairman of its board.[217]   On appeal, the executive challenged the district court's personal jurisdiction, asserting that contact imputation was inconsistent with the Supreme Court's 2014 decision of *Walden v. Fiore*, which stated that jurisdictional contacts are "contacts that the defendant himself creates."[218]

---

[211] *Id.* at 1264 (citing 1 W. Fletcher, Cyclopedia of the Law of Private Corporations § 41.35 (rev. ed. 1983)).

[212] *Id.* (quoting Fletcher, *supra* note 211, § 45).

[213] *Id.* at 1265.

[214] *Id.*

[215] 987 F.3d 1340 (11th Cir. 2021).

[216] *Id.* at 1343–44.

[217] *Id.* at 1345.

[218] *Id.* at 1354–55 (quoting 571 U.S. 277, 284 (2014)).

The Eleventh Circuit rejected the executive's arguments, observing that the principle articulated in *Walden* is not inconsistent with imputing contacts because "jurisdictional veil piercing . . . is based on the rationale that when a defendant exerts a high degree of control over an entity, the contacts created by the entity are, in reality, created by the defendant."[219]  The court also recognized more generally that, "[r]egardless of whether the actors are two companies, or a company and an individual, the rule . . . is that where the apparent forum contacts of one actor are really the forum contacts of another, it is consistent with due process to impute those contacts for personal jurisdiction purposes."[220]  As to what the relators had alleged, their "Fourth Amended Complaint include[d] allegations that [the executive] unilaterally controlled [the company], ignored corporate formalities, and commingled his personal assets with corporate assets."[221]  Thus, because the relators had "sufficiently alleged that [the company] was [the executive's] alter ego," the court held that they had made their prima facie case, and the company's "suit-related forum contacts [could] be imputed to [the executive] for the purposes of the personal jurisdiction analysis."[222]

Looking to Larada's new allegations in the PSAC—as the court does when considering whether to grant leave to amend—the facts surrounding FloSonix Ventures' founding and the Fasslers' subsequent management of the two companies bear notable similarities to the facts in *3M*, *Bibby*, and *US Magnesium*.  Assets are regularly intermingled between Pediatric Hair, FloSonix Ventures, and the Fasslers personally.[223]  FloSonix Ventures shares two employees

---

[219] *Id.* at 1355–56 (citing *Patin*, 294 F.3d at 653).

[220] *Id.* at 1355.

[221] *Id.* at 1356.

[222] *Id.* at 1346, 1356.

[223] Dkt. 160-1 ¶¶ 81–83.

with Pediatric Hair, but has no payroll of its own.[224]  Sheila Fassler "owns 100%" of both

companies.[225]  Communications regarding the business from both companies is intermingled,

with the same email addresses being used interchangeably on behalf of both companies, the two

companies sharing the same phone number until 2019, and both listing the exact same street

address on official documents as recently as 2020.[226]  All these facts evince the unilateral control

of both entities by a single individual, ignoring corporate formalities, and frequent comingling of

assets—all of which was found sufficient to make a prima facie case for jurisdictional veil-

piercing in *Bibby*.[227]  A similar conclusion is warranted here.

Furthermore, as with the companies in *US Magnesium*, there is significant overlap in the

employees, officers, funding, and operations between the two companies.  FloSonix Ventures has

no employees or payroll that are entirely its own, and instead shares its two employees with

Pediatric Hair and relies on Pediatric Hair to pay those employees.[228]  Relatedly, all of FloSonix

Ventures' officers are the same officers as Pediatric Hair.[229]  Both companies are dependent on

one another for financing, and FloSonix Ventures has a substantial informal loan from John

Fassler.[230]  Given the overwhelming overlap in financing, employees, decision-making, and

operations, Larada has sufficiently alleged that the two companies have "a unity of interest and

ownership," such that Pediatric Hair's contacts with Utah may be imputed to FloSonix Ventures

for jurisdictional purposes.[231]

---

[224] *Id.* ¶ 65.

[225] *Id.* ¶¶ 61–62.

[226] *Id.* ¶¶ 74, 75, 86, 87.

[227] *See* 987 F.3d at 1356.

[228] Dkt. 160-1 ¶ 65.

[229] *Id.* ¶¶ 63, 65.

[230] *Id.* ¶ 81.

[231] *See US Magnesium*, 2019 U.S. Dist. LEXIS 68562, at *11.

One potential concern, as Larada readily admits, is that the Fasslers and Pediatric Hair began their plans to develop a new product based on Larada Devices "years before the formation of FloSonix Ventures."[232]  Indeed, most of the events forming the basis of Larada's claims happened before FloSonix Ventures existed.[233]  However, similar chronological issues were found not to preclude imputation of contacts in *3M*.  As with the out-of-state company in that case, FloSonix Ventures has received many assets from Pediatric Hair—not least of which is the intellectual and personal property Larada alleges was stolen and misappropriated to create the FloSonix Devices.[234]  Indeed, Larada claims FloSonix Ventures was "founded . . . for the express purpose of using Larada's trade secrets and Confidential or Proprietary Information to continue developing the FloSonix Device, bring it to market, and compete with Larada."[235]  FloSonix Ventures can thus be viewed as "merely a continuation" of Pediatric Hair—at least in terms of the efforts to develop and bring to market the FloSonix Device.[236]  Moreover, while not directly stated in the PSAC, the implication of Larada's allegations is that FloSonix Ventures was created at least in part as a "posttort activity, . . . conducted to strip [Pediatric Hair] of its assets in anticipation of impending legal liability."[237]  That is, Pediatric Hair and the Fasslers are alleged to have committed torts and other unlawful activity against Larada, then created a new company that was really their alter ego to continue the tortious conduct through a new business opportunity.[238]  Furthermore, Larada alleges that, if not directly complicit in the original tortious activity, FloSonix Ventures continues to contribute to wrongs against Larada because the

---

[232] *See* Dkt. 160-1 ¶ 76.

[233] *See id.* ¶¶ 32–50.

[234] *Compare id.* ¶¶ 52, 55, 58, 89, 91, *with 3M*, 757 F.2d at 1262–63.

[235] *Id.* ¶ 88.

[236] *See 3M*, 757 F.2d at 1262.

[237] *Id.* at 1264 (quotation simplified).

[238] *See* Dkt. 160-1 ¶¶ 88–92, 170–74.

company is charged with knowing that Pediatric Hair and the Fasslers were providing it with "trade secrets . . . acquired through improper means."[239]  As with *3M*, strict observance of the corporate form is inappropriate under such circumstances, allowing for imputation of the other Defendants' contacts to FloSonix Ventures for jurisdictional purposes.

Defendants oppose the ability to impute contacts to FloSonix Ventures largely by focusing on the standards to establish alter ego liability under Utah law, both addressing the standard on the merits and also presenting a nuanced statutory interpretation analysis about whether those principles are even intended to be applied to LLCs.[240]  These arguments are ultimately inapposite to the issue at hand.  There is an important distinction between a party relying on an alter ego theory to establish *liability* on the underlying claims and borrowing alter ego principles for jurisdictional purposes.  To be sure, some courts use state law standards on alter ego liability as an analytical lens when analyzing jurisdiction.[241]  But using such standards as an analog does not convert them into legal prerequisites to disregard the corporate form for purposes of imputing minimum contacts.

Indeed, courts have repeatedly recognized that the plaintiff's showing is less burdensome when attempting to impute contacts through an alter ego as opposed to establishing liability based on the actions of an alter ego.  For instance, a sister district has rejected the position that "the requirement to present a prima facie case [of jurisdiction] could be interpreted as a requirement to present a prima facie case of all elements of a veil-piercing or alter ego claim,"

---

[239] *Id.* ¶¶ 170, 171, 174.

[240] Dkt. 183 at 4–8.  Larada also focuses a portion of its briefing to applying Utah's standards for alter ego liability to the facts of this case.  Dkt. 182 at 4–8.  But for the same reasons expressed in the main text, this aspect of Larada's argument is equally unnecessary for purposes of resolving the instant Motion.

[241] *See, e.g.*, *US Magnesium*, 2019 U.S. Dist. LEXIS 68562, at *11–12 (reciting and applying elements required to "establish that one corporate entity is the alter ego of another" under Utah law (citing *Mun. Bldg. Auth. of Iron Cnty. v. Lowder*, 711 P.2d 273, 278 (Utah 1985))); *Avtech Capital*, 2020 U.S. Dist. LEXIS 212915, at *13–14 (reciting requirements to establish alter ego liability under Florida law).

pointing out that "[t]he Tenth Circuit has instructed district courts 'to keep the Rule 12(b)(2) and Rule 12(b)(6) analyses distinct.'"[242]  And the Tenth Circuit itself has recognized in dicta that an alter ego or veil-piercing theory "in a jurisdictional context" to establish minimum contacts does not necessarily translate into applying the same theory toward "substantive liability."[243]  Therefore, because there are sufficient allegations to support that FloSonix Ventures is the Fasslers' and Pediatric Hair's alter ego for jurisdictional purposes, it is unnecessary to apply alter ego liability principles under Utah law.

Defendants also caution the court against "expand[ing] Utah law," citing the established principle in the Tenth Circuit that federal courts are "generally reticent to expand state law without clear guidance from the highest court."[244]  In essence, Defendants contend that, because the Utah Supreme Court has not spoken directly on piercing the corporate veil with an LLC, nor imputing contacts based on an alter ego theory, the court deciding to do so here poses the risk of unnecessarily expanding state law.[245]

The court is certainly mindful of these important principles.  But the court is not being asked to determine a question of alter ego liability; rather, it is being asked to decide whether to allow leave to amend a complaint.  And, at such a posture, the Tenth Circuit has given equally forceful admonitions that leave to amend is to be freely given so that cases may be decided on their merits,[246] and that if the law is in any way "unsettled" or "unclear" on the issues purporting

---

[242] *Warad West*, 119 F. Supp. 3d at 1298 (quoting *Newsome v. Gallacher*, 722 F.3d 1257, 1270 (10th Cir. 2013)).

[243] *See Floyd v. IRS*, 151 F.3d 1295, 1299 n.4 (10th Cir. 1998) (recognizing the ability under Kansas law to find minimum contacts of an alter ego corporation "on the grounds that its co-defendant parent corporation transacted business within the state," but distinguishing that as a different inquiry than whether "the subsidiary's assets were reachable as a result of the parent's substantive liability" (citing *Farha v. Signal Cos.*, 532 P.2d 1330 (Kan. 1975)); *see also id.* ("[T]he *Farha* decision is best understood as limited to the jurisdictional context; these jurisdictional standards should not be presumed to translate into substantive corporate law.").

[244] Dkt. 183 at 3, 8 (quoting *SCO Grp., Inc. v. IBM*, 879 F.3d 1062, 1082 (10th Cir. 2018)).

[245] *Id.* at 6–8.

[246] *See Minter*, 451 F.3d at 1204.

to make a proposed amendment futile, courts should generally resolve such uncertainties by granting leave to amend.[247]  Moreover, as just discussed, the court is not purporting to directly apply the rule on alter ego liability under Utah law.  The decision to impute jurisdictional contacts here is based on a body of federal case law concluding that the imputation of contacts does not violate due process when there are sufficient factual allegations to support that two entities effectively operate as one.  And "the Utah Supreme Court has explicitly said that 'any set of circumstances that satisfied due process will also satisfy the long-arm statute,'" subjecting the party to the jurisdiction of Utah courts.[248]  The court's decision here does not pose a risk of expanding Utah substantive law, but is instead decided under federal authority determining the scope of personal jurisdiction consistent with due process.

## CONCLUSION

Larada has shown good cause for amendment under Rule 16 because it learned significant new information during discovery, the information was materially different than deponents' prior sworn statements, and Larada moved to amend in a reasonable amount of time following the depositions.  Amendment will not be futile because, based on the allegations in Larada's Proposed Second Amended Complaint, the new facts are sufficient to state a prima facie case that FloSonix Ventures, LLC is subject to personal jurisdiction in Utah.  This is because the new allegations tend to establish that FloSonix Ventures is an alter ego of the other Defendants, allowing their contacts to be imputed to FloSonix Ventures for jurisdictional

---

[247] *See Seale*, 32 F.4th at 1029.

[248] *Rusakiewicz*, 556 F.3d at 1100 (quoting *SII MegaDiamond, Inc. v. Am. Superabrasives Corp.*, 969 P.2d 430, 433 (Utah 1998)); *see also id.* (noting that because Utah's long-arm statute makes personal jurisdiction of Utah courts coextensive with the reach of the Due Process Clause, the statute "collapses the Utah standard into the more general due process standard for jurisdiction" (citing Utah Code Ann. § 78B-3-201(3))).

purposes.  Therefore, Larada has satisfied its showing under Rule 15.  For these reasons,

Larada's Motion for Leave to Amend Second Amended Complaint[249] is GRANTED.

SO ORDERED this 16th day of February, 2023.

BY THE COURT:

ROBERT J. SHELBY
United States Chief District Judge

---

[249] Dkt. 160.