# Exhibit C: Plaintiff's Closing Arguments

1    end of the form.

2        There's a place for the jury foreperson to sign and

3    date the form, and you're instructed to notify the Court's

4    security officer that you've reached a verdict.

5        That's long.  I appreciate -- and it's dense.  I

6    appreciate your attention.

7        I think what we should do now, so we have a fresh and

8    open mind for closing arguments, is we'll take a short recess,

9    10 or 15 minutes, just to stretch our legs, clear our heads.

10   We'll come back and hear from the lawyers, and then you'll

11   begin your deliberations.  Thank you.

12       Oh.  Still too early to talk about the case.  We'll

13   start after we hear from the lawyers.  Thank you.

14           **THE COURTROOM DEPUTY:**  All rise for the jury, please.

15           (Jurors exit the courtroom at 10:27 a.m.)

16           **THE COURT:**  Thank you.  We'll see you in a few

17   minutes.

18           (Recess taken by the Court at 10:27 a.m.)

19           **THE COURTROOM DEPUTY:**  All rise.

20           (Jurors enter the courtroom at 10:43 a.m.)

21           **THE COURT:**  Please be seated.

22           **MR. STASIEWICZ:**  Thank you, Your Honor.

23                      **CLOSING ARGUMENT**

24   BY MR. STASIEWICZ:

25           Members of the jury, good morning.  I'm glad I'm

9

1   finally able to address you after two weeks.  I know you've had

2   to listen to a lot, and it's a great imposition on your time.

3   I can tell you that on behalf of my client and my co-counsel,

4   Doug Smith, and the key to the whole operation, Eric Largen, we

5   really appreciate the time and attention you've put into this

6   matter.

7          I know that parts of any court case can be not the

8   most exciting.  Some of it can be confusing, and Doug told you

9   last Tuesday that at the end of the evidence, I would be

10  addressing you and putting some of the puzzle pieces together

11  of the different things that we've heard from all the different

12  witnesses, from the documents, from the depositions, and how

13  they all relate to what we're -- what brought the parties into

14  court on this matter.

15         So, essentially, in this case, we have three separate

16  claims that all relate to, essentially, the same set of facts.

17         We have the -- can the jury see that?  All right.

18         We've got breach of contract, a breach of covenant of

19  good faith and fair dealing, and, of course, misappropriation

20  of trade secrets, which is what we've been talking about

21  directly the most.

22         Now, I think, as far as breach of contracts go,

23  that's something that you're probably generally familiar with,

24  although we'll get into the law a little bit later.

25         I think we all know that there's really no question

1    in this case that the defendants breached their agreements that

2    they were subject to, the agreements that bound them to keep

3    Larada's information -- confidential information confidential.

4    And that information included the AirAllé device, the device

5    that was the basis of the business they'd built to treat lice

6    clinics.

7            So in front of you, you'll see the different

8    contracts, and the breaches.

9            So we have Sheila Fassler, who's subject personally

10   on the 2010 lease agreement.  So at all times that she had

11   access to the AirAllé device, she was covered by a lease

12   agreement on that personal provision.

13           PHS was always covered under one of the three

14   different agreements that it entered into over the course of

15   the events that happened in this case.

16           We have the 2010 agreement, followed by the 2013

17   agreement, and the 2015 agreement.  There's confidentiality

18   provisions in all of those.

19           Separately, as you've already heard discussed, there

20   was a breach of contract claim for the non-payment of the usage

21   fees under the 2015 license agreements, and that's already been

22   resolved, and you're not going to be addressing that in your

23   deliberations.

24           John Fassler's contract situation is a little bit

25   different.  He didn't have a contract that he was personally

1  liable on until the 2015 consulting agreement.  So we'll

2  discuss how that relates to the facts of this case and his

3  liability a little bit later.

4          But as I go through a timeline of what we talked

5  about so far, I just want you to keep in mind what really

6  happened.  Right?  We've got, on multiple occasions, the

7  disclosure of the AirAllé device to engineers to create a

8  competing device.

9          We've got disclosure and we've got use.  In the

10  context of trade secret misappropriation, we've already heard

11  that acquisition, disclosure, and use all -- all are sufficient

12  by themselves to constitute a breach -- a misappropriation of

13  trade secret.  And so as we go through that timeline, I'm going

14  to try to point out so you remember where the disclosure and

15  use happens.

16          We've got four trade secrets, and we're going to get

17  into the specifics of how the facts that you've heard relate to

18  law and trade secrets a little bit later.  But for now, I want

19  to get into actually what happened in this case.  And I want to

20  make this point before we get into it.

21          If we could go to two slides further, please.

22          So I want to talk about what this case is not about

23  for a second.  The case is not about whether any of the four

24  trade secrets are physically incorporated into the FloSonix

25  devices.  The word is "use," not "incorporation."  Use is

1    broad.  Use in research and development is use.  So that's not

2    what we're looking at here.

3            What we're looking at is the disclosure of the

4    devices given to PHS.  Sheila and John Fassler have access to

5    it through the context -- through their work at PHS.  Sheila is

6    owner.  John is national medical director.

7            And then the disclosure of that information to Kevin

8    Dahlquist and Enventys Partners.  The disclosure, by itself,

9    supports our damages theory.  But, of course, there's more than

10   just disclosure here.  There's disclosure and a continuing

11   repeated use of these trade secrets.

12           And we'll get into all the details about it, but

13   that's what the case is about.  Whether a certain component or

14   a certain combination of components is found in this machine

15   doesn't affect our claim for misappropriation of trade secrets.

16           So with that said, let's recap what we heard, because

17   we heard from a lot of different people.  And I had the

18   timeline in front of me the whole time, so I know what happened

19   when, but you don't have that benefit, and so that's what we

20   want to go through with you right now.

21           So you know that we founded Larada in 2006.  And

22   Larada was, of course, founded to commercialize an invention

23   that had already been proven from the University of Utah, a

24   treatment for hair lice -- head lice.  I'll get it right one

25   day.

1    Now, you've heard, you know, heated air can kill ice.

2    But getting that product to market in the way that John Beck

3    talked about, with the reliability, the durability, dealing

4    with all the issues, getting the power draw to work on a 15-amp

5    circuit and deliver those parameters and deliver them

6    consistently, that took years of work.  It took a lot of

7    engineers, and it took a lot of money and expenses.

8    It was the whole point Larada was founded.  Larada is

9    not GE.  It's not a company that has millions of, you know,

10    different projects going on in their research division.  This

11    was the one thing they had going on when they started.

12    So that development continued from 2007 into 2013.

13    Now, we know that the device was introduced in 2010,

14    but those refinements that kept going on.  There's software

15    refinements.  Those are the things that contributed to the

16    durability and reliability of the machine, that made it

17    valuable, that made it something that people like the

18    defendants wanted to build a business on.

19    So let's go forward.

20    And so that's what happens.  At the very end of

21    November 20 -- of 2010, Sheila Fassler enters into a lease

22    agreement for the then-LouseBuster device with Larada.  She

23    signs it personally and on behalf of PHS, and she's obligated

24    to keep it secret.  They're just mobile at this point.  PHS has

25    just one -- you know, they're just taking it on the road.  But

1    it doesn't take long before they have a physical location,

2    based on the success of the device.

3            Go forward.

4            And here you see Exhibit 81, and that call-out at the

5    bottom is the personal guaranty by Sheila that she understands

6    to not disclose confidential trade information.

7            From 2010 to 2013, not much happens, other than

8    Sheila's business built on the AirAllé continues to grow.

9            In 2013, PHS enters into a new agreement, the rental

10   agreement.  And then --

11           Moving forward.

12           -- once again, you see that we have language that

13   covers the proprietary information, including the devices.

14           Going forward.

15           And then things -- where things really start

16   happening in this case in September 2014, because now, for the

17   first time, John Fassler emails Kevin Dahlquist, and tells him

18   that he wants a replacement device for what they've been using.

19           The testimony is that there was some thought that

20   Larada was going to go out of business.  Well, we have PHS had

21   signed agreements in 2013, and 2015.  In 2014, at this moment,

22   they're claiming that that's what they believe.

23           And so they meet with Kevin and tell him, "For

24   reasons I will not go into, I believe Larada Sciences is close

25   to going out of business."  That's what they tell him.

1    Kevin doesn't know.  Kevin is -- you met him.  He's

2  somebody who's engaged in his work.  He likes working on

3  projects.  You heard him also say that he was never told that

4  Sheila or PHS, or later John, were not allowed by contract to

5  share that information.

6    We also heard how Kevin needed new tools to measure

7  the AirAllé device.  Even though he works in product design,

8  the tools he had on hand weren't sufficient.

9    Next, please.

10    He needs a pitot tube measurement to capture the

11  rates of 50 meters a second and higher that we expect to see.

12  Those are pricier, but they're a good investment for this

13  critical number to your product.  And the Fasslers, on behalf

14  of PHS, pay for that.  That's followed by the presentation in

15  December of -- well, we can skip to the presentation, but...

16    Go forward a couple, please.  One more.  Thank you.

17    That's the presentation, December 31, 2014.  The only

18  other product on the market that they can benchmark against is

19  the one they're contractually obligated not to share with Kevin

20  Dahlquist.  That's all they've got.  That's the only thing they

21  can look at.  Kevin said, "You can't go to Walmart and buy a

22  LouseBuster."

23    Go back a couple, please.

24    And that's what results, in January of 2015, this,

25  the first test data regarding the AirAllé.  We have good

1   evidence that the Larada device was actually inspected,

2   measured, and specs were taken.

3           Shortly after this, the project drops for a while.

4   And if that's all that ever happened, I doubt we'd ever be

5   here, because we'd never know anything about -- there'd be no

6   FloSonix device, and we never would have known this happened.

7           Forward, please.

8           But instead, right at the same time as those

9   measurements are being taken, the Fasslers join the advisory

10  board, at the invitation of Larada.  And they get closer to

11  Larada's internal discussions and what's going on with the

12  shape of the business.

13          And over the course of the next several months, they

14  continue to have the ear of management, and it results in John

15  Fassler, who is already the national medical director of PHS,

16  joining as national medical director of Larada.  That's when he

17  enters into his contract.

18          Now, the language that we're focusing on here is a

19  little bit different.  Here, "consultant agrees" -- and the

20  consultant is John Fassler -- "that he will not use or permit

21  the use of company's confidential information in any manner or

22  for any purpose not expressly set forth in this agreement; and

23  that he'll hold such confidential information in confidence and

24  protect it from unauthorized use and disclosure and will not

25  disclose such confidential information to any third parties."

1    And we know that he's going to permit the use, at

2    least, if he doesn't use it himself.  And he's not going to

3    protect the confidential information from unauthorized use and

4    disclosure.

5    Shortly, about a month after that, Larada -- PHS

6    enters into the license agreement.  Sheila, on behalf of PHS,

7    enters into seven different agreements, all the confidentiality

8    provisions that she initialed every page of.  And we've covered

9    these, and I'm not going to read it all to you, but they

10   prevent divulging the information, copying the information,

11   reverse engineering it, or duplicating it.

12   Then, once again, there's a period of not much

13   activity, but we hear some testimony about the 2.0 coming out.

14   And shortly after a meeting about the status of the 2.0, Sheila

15   Fassler goes back to Kevin Dahlquist and forwards the

16   presentation about the AirAllé 2.0 to him.  That's the

17   beginning of the real phase of beginning the FloSonix

18   development process in earnest.  It really started in 2014, but

19   the big work is starting to be done now in 2016.

20   So there's the presentation, and we're moving on, and

21   by August 29, 2016, Kevin is talking about reskinning actual

22   AirAllé units.  He talks about two different paths that they

23   were talking about going down.  I don't know how Kevin thought

24   they were going to get their hands on our devices, but that's

25   something he was working on at that time, the line enclosure

1    around the actual gusts inside the AirAllé.

2          And then what we know, shortly thereafter, firstly,

3    that the device is on TV, shown functionally, the 2.0 device;

4    and so, even though it never made it to market, it's shown that

5    it's got potential and that Larada is really working on it.

6          Next, please.

7          And then in September of 2016, we have the real

8    unquestionable evidence that the AirAllé has been disclosed.

9    It's been given to Kevin Dahlquist.  He opens it up, and he

10   takes photos of it.  And we'll look at that a little bit later

11   in the timeline.  But that's the point in the timeline -- we'll

12   get to the exhibit in a moment, but that's where we know --

13   we've got the ruler next to it.  He's talking about what he's

14   learning from the inside of the AirAllé components.

15         Next, please.

16         By November, Kevin Dahlquist is measuring five

17   different devices, all provided to PHS, to get consistent

18   temperature readings.  Those are the airspeeds.  Those are the

19   temperatures that he's reading.  This is, again, November 18,

20   2016.

21         Moving on, please.

22         In December 2016, Sheila is opening new clinics and

23   remodeling clinics that she has; right?  They spend money in

24   that remodeling, and right around the same time --

25         Next, please.  Next.

19

1      And the month later, Sheila tells Claire that PHS

2  won't pay usage fees.

3      Next, please.

4      We've looked at 211 a lot.  In 211 -- we don't need

5  to read it again, but I want to point out that on the same day

6  the first AirAllé subject is listed on the data collected for

7  the clinical results comparison study with John Fassler's name

8  on it as medical director of PHS comparing the AirAllé class 1

9  medical device, the predicate device, versus the FloSonix

10  device.

11      Forward, please.

12      At the same time, Sheila's still communicating with

13  Kevin Dahlquist about development.

14      And then by February 14th, before the termination

15  comes, John Fassler buys the first Flying Pig.  Now, he says he

16  did it without remembering anything that Kevin Dahlquist told

17  him.  You're in the position to evaluate credibility of the

18  witnesses.

19      By February 28, 2017, we have the first FloSonix test

20  subject in that study.  We already had the Flying Pig show up.

21  Sheila put it on somebody's head.  It has back pressure issues,

22  and its noise -- has a lot of noise, but it seems like it might

23  be something that's going to work.  Great; they've got the

24  backup plan in place.  Nothing more needs to be done.

25      By May 4, 2017, FloSonix LLC is founded.

1        Which is very much out of order on this slide that we

2   put together yesterday.

3        We're still in March of 2017.  That's when the

4   termination letter comes.

5        And then moving on, we're going to look at -- on the

6   same day -- well, several days later, we'll have the first

7   email, 162, where we have Kevin telling Sheila that the heads

8   he's designing to use with the Flying Pig, because the

9   attachments that come with the Flying Pig aren't good enough

10  for lice treatment, it's going to take him a little bit longer

11  to get those made.

12       And so in the interim, what they're going to use is

13  the copies made from the actual head of the AirAllé device,

14  using the process that Kevin talked about, and being able to

15  use the Larada tips that they still had access to on the new

16  devices that they were developing.

17       Next, please.

18       By March 20th -- next.

19       Kevin is taking thermal imaging of the way the air

20  flow comes out of the Larada head.  That's information that he

21  could only get with access directly to the AirAllé machine.

22  And even if he had access to it, he needed to take further

23  steps to understand the thermal aspects of the heat inside the

24  head and the way the air flow comes out.

25       Next, please.

1    Then on August 9, 2017, we have him asking for even

2    more thermal imaging.  He wants to do thermal imaging to view

3    flow characteristics, pressure within the head which indicates

4    how restricted the head and cones is, how close the heated air

5    gets to the scalp, and how effective the whole system is at

6    dehydrating.

7    And then he's going to propose the cobalt chloride

8    tests that we'll talk about in a second.

9    And he's still talking about using the PHS heads at

10   the same time.  "I like this plan because it allows you to use

11   the cast Larada heads in the interim, as well as the new heads

12   when they're ready."

13   Next, please.

14   Around the same time, Kevin's also saying that he

15   doesn't exactly understand what's really the key to the AirAllé

16   device, but he wants to learn.  He has no way of knowing how

17   thorough Larada was in their research.  And he's going to learn

18   it from this machine.  Maybe they were like, okay.  That's good

19   enough.  Maybe the exact pressure, temp and flow, the critical

20   components for success of the system, we don't really know,

21   yet.  So he's going to find out.

22   But Larada knew.  Because Larada had actually put in

23   the work.  Larada had worked for years.  Larada followed an

24   actual design process that was worried about how things might

25   work, how things could go wrong, how it was going to look when

1    the FDA came calling and if they hadn't done their homework.

2    And that's what's embodied in that device:  Years and years of

3    that work.  Every selection that was made and put in those

4    components in that machine was done with a view to that.

5         Kevin's going to learn it, but he's going to need an

6    even better thermal imager than he, who works and has all these

7    gadgets, had access to.  And, again, it's the defendants who

8    were going to buy it for him.

9         Next, please.

10        Sheila says, "Go ahead and order whatever you need to

11   test and demonstrate those values."

12        Next, please.

13        So Kevin's explaining that all testing is relative.

14   We're trying to assess any difference of an effectiveness

15   between the two head types rather than absolute numbers.  We're

16   saying is this better, worse or equal to that?

17        And this is important because I've talked about

18   relative testing before, but what I'm saying is they've got no

19   way of knowing whether their machine works on lice unless they

20   compare it to what they already know works.  They don't do

21   clinical trials.  They just throw it into the clinic and see if

22   somebody still has lice after they're done.  And on top of

23   that, they're using dimethicone before and after they do the

24   treatment.  So the actual efficacy of the machine themselves,

25   they have no idea of that.

23

1    So instead, Kevin proposes using the Larada head and

2    the FloSonix head next to each other to dry out those beads we

3    looked at, and we'll look at them again in a second.  Say that

4    Larada had took 10 minutes to deliver an effective color

5    change.  If our head can do it in 9 minutes, then it's a

6    significant, 10 percent improvement.  That's the extent of

7    their research on efficacy of lice treatment.

8        Next, please.

9        As Kevin is working on that head, he's got

10   limitations on the electronics.  And so he needs some help from

11   Enventys.

12       Now, you've heard about the electronics in the

13   AirAllé.  They're complicated, because controlling this

14   temperature flow is very difficult.

15       So Kevin is struggling with it, and so he goes to

16   somebody who knows more about it.  And that's when they move

17   the presentation, and this one still has the cast head from the

18   Larada --

19       Next, please.

20       -- obsolete blower head.  This will change.  But in

21   August of 2017, it still has it.

22       Next, please.  Go ahead.

23       So now we're talking about that thermal imaging.

24   This is the higher quality thermal imager.

25       Now, on the next slide, we'll see exactly what he's

1  talking about.  We're going to have the FloSonix head and the

2  Larada head next to each other, and we're going to compare how

3  the Larada dries things up, how the FloSonix dries things out,

4  what their internal pressures are, the temperatures that are

5  being applied, all the patterns and everything they can glean

6  from it.  That's what they're learning here.

7          And this is the basis of all their testing.  This is

8  the most obvious visual way to look at it.  But everything they

9  do when they talk about the power draw, the flow rate, it's

10  all -- is it more or less?  Can we go up and down here, and

11  then how do we compare it?  They have no idea of any absolute

12  value of any of this without reference to our machine.

13          Next, please.  Next.  Next.  Thank you.  Keep it

14  moving.  One more.  Thanks.

15          September 27, 2017.  All the machines are supposed to

16  be back, but we heard that Kevin still had a machine.  And here

17  we see that, "understand that Sheila still has a Larada device.

18  So it might be a good idea to put it through more advanced

19  testing, as I did, with the new head if we're considering that

20  the 'to beat' benchmark."

21          Now, I'm not sure if that testing happened or if it

22  happened at this time.  We know there's going to be further

23  disclosure of the machine, but I also want to highlight how

24  often in the process the thought occurs to defendants, or the

25  people working for them, that, "Oh, we have a design problem?

1  I know where we can look to get an idea.  We're going to look

2  in the machine again, and we're going to use the trade secrets

3  in it to find out what we can do in our development process."

4        Next, please.

5        That leads me to this power drive.

6        Keep going.

7        And that's what's going to lead to --

8        Keep going, please.  Again.

9        -- yet another proposal for a retest.  And the

10  discussion at this time, when these documents -- we've got

11  Enventys getting involved.  And Ben Gatti is working on theé

12  electronics, but at the same time, he's noticing that the power

13  draw is very high.  Because the FloSonix device, the Flying

14  Pig, and the original one blows way more air than the AirAllé,

15  and it's tripping breakers.

16        It works fine in the PHS clinics because they've

17  upgraded their breakers -- or their wall outlets, I should say.

18  Excuse me.

19        But if they want to have a device they can take to

20  market for other people, they're going to need it to work on a

21  standard 15-amp outlet.

22        And so because of that, the scope of the Enventys

23  project goes from just the electronics to now working on

24  sourcing a new motor.  And that's going to start happening late

25  2017, and especially early 2018.

1    There's one other thing I really want to emphasize.

2    Next, please.

3    And that's the concept of what you learn by what's

4    absent.  We know that you can look in this machine, and we know

5    that they didn't copy piece for piece all of its components.

6    They're too expensive.  But we also know that they're learning

7    from what's not in there.  And this is what Kevin is talking

8    about here in the second call-out.  "I think, from a functional

9    perspective, the Larada is successful with none of these

10    features and a single sensor.  No flow sensor, no PCB

11    interrupting the air flow."  And he's going to echo that

12    concern in February of the same year -- or the next year.

13    Can we keep moving, please.

14    Again, in November of 2017, talking about how to do

15    control of regulating temperature.  He's again advocating for

16    one sensor.  That was the Larada solution, and it wasn't a

17    problem.

18    Next, please.

19    By January of 2018, Sheila is marketing the FloSonix

20    in Nashville.

21    Next, please.

22    And now we get to the motor selection process.  Dana

23    Buffo, PHS employee, forwards the AirAllé specs to Jeremy Losaw

24    at Enventys.  We saw that spreadsheet.

25    Next, please.  Next.

1    There it is; right?  There's all the information they

2    took from the Larada motor.  They've got only the Flying Pig to

3    compare it to.  And that's January 24, 2018.

4    Next.

5    On February 2, Dana Buffo reaches out to ebm-papst.

6    And she's looking for exactly the same motor that we have in

7    our machine.  And she's asking questions about whether they

8    have something similar; right?  That's what the discussion is

9    here.

10    That goes to -- that email goes to Jeremy, and Jeremy

11    forwards it to TJ.  That's February 8, 2018, which is the same

12    day that TJ ends up picking the motor that ends up being used

13    in the gray top.

14    Next, please.

15    At the same time, Kevin's in China, also sourcing

16    motors.  He's sad that TJ beats him to the punch.  He's having

17    material tests done on the Larada hose.

18    Next, please.  Keep going.  Next.

19    And we know, again, here's disclosure.  Once again,

20    the AirAllé device that they still have access to, almost a

21    year after termination, is at Enventys, being documented,

22    having parts noted, and that leads to the selection of the gray

23    top motor using the Larada specs.

24    Next, please.  Next.  Next.

25    Once again, as I've talked about, "the biggest hangup

1    is that there is no such flow sensor in the Larada, and that

2    has been a reliable performer for the last decade."  So, again,

3    advocating for not including something in the design process

4    based on information.

5         Now we're a year into the process, and they're still

6    working on the machine that was so simple and that's so easy to

7    make.

8         Next.

9         Oh, sorry.  In April of 2018, this is Jeremy Losaw,

10   for a change, talking about the Larada flow rate and how

11   Enventys has been working towards matching it.  And they've

12   succeeded on that front; however, "it does not seem to be

13   working as well as we thought and requires a new direction."

14   Because there is more to the efficacy of the machine than the

15   flow rate and the temperature that comes out.  And that's what

16   John Beck talked about.

17        Next, please.

18        Over and over, document after document.  I'm not

19   going to go through them all, because we'd be here for days.

20   You see these references to using the Larada as a baseline, for

21   its wattage, talking about the RPMs of its motors, just how

22   it does things, what the noise level is.

23        September, October, November, January, February,

24   April, we have these references.  Even in May of 2018, PHS is

25   still using Larada parts in its design process.

1          Next, please.

2          We've got TJ Root asking for pictures side by side of

3     the head and hose, and we know that that picture was taken for

4     him.  He also says in this document, although it's not called

5     out, "If we want to try and put a Larada end on the 1.5 hose,

6     we could absolutely do that as a test."  They still have all

7     these parts and all these elements of the Larada that they can

8     absolutely test whenever they run into a design obstacle.

9          Next, please.

10          We also -- this is testimony that Dahlquist, the

11     actor, put on during the deposition where we talked about how

12     the tips were made.  You'll have access to that.

13          Next, please.

14          So we've talked on multiple occasions there about the

15     disclosure of how -- how this machine was provided by -- by PHS

16     to its outside partners.  That's repeated disclosure.  Any one

17     of them is a breach.  PHS breached its license agreements.  We

18     did everything we were supposed to do under those agreements,

19     provided them product that worked, that was the basis of their

20     business, and they disclosed.  That's the breach.  We'll get

21     into the law about that later.

22          Next, please.  Next.

23          Sheila also breached.  She was involved.  She was the

24     one directing Kevin on a day-to-day basis.  That's the nature

25     of -- she violated this covenant; and, again, Larada had done

1    everything that it was supposed to do under those agreements.

2            Next, please.

3            We talked about how John Fassler's contract is a

4    little bit different.

5            So we have his involvement in the testing of the

6    AirAllé device and the obvious -- that he knows from the

7    invoices that the device is being used.  He does nothing to

8    stop the use of that confidential information, as he's

9    obligated to do under this confidentiality agreement.  And he

10   uses the device in the same relative way as Kevin Dahlquist

11   does, to compare the AirAllé and FloSonix study, whether they,

12   side by side, work as well in the clinic.  He's the national

13   medical director of PHS, and he puts his name on that study.

14           Next, please.

15           He also purchases the Flying Pig based on the data

16   that he got from Kevin Dahlquist.

17           So I want to talk a little bit now about trade

18   secrets.  And before we talk about trade secrets, I just want

19   to remind you of a couple of things.

20           First of all, John Beck explained that the trade

21   secrets that he's talking about are combinations of different

22   portions of the machine.  He said that the four kinds of

23   categories of trade secrets --

24           Next, please.

25           -- that he --

1        Next.

2            -- talked about were all part of an interdependent

3   system.  He said that they worked in harmony.

4            And our damages theory, that we'll get to in a

5   moment, that's not based on how much of one trade secret or

6   another is worth something or something else.  These four trade

7   secrets, in combination with some overlap, essentially make up

8   the entirety of the AirAllé device.  You can't make any of

9   these trade secrets without making the device, and vice versa.

10  And that's why we got a good development process of the device.

11  There was no other device like this.  We made it from scratch.

12           Just to explain a little bit about the categories of

13  trade secrets, John's first trade secret is entitled -- relates

14  to alpha parameters for volumetric flow rate and temperature.

15  But in his testimony, Mr. Abarca was speaking to it, that three

16  and four were subsets of one, and he explained that that wasn't

17  necessarily the case, and that one is more encompassing, it

18  includes more interaction, more interactivity between various

19  components to achieve the effect that the machine is used.  So

20  it includes the entire machine and the systems as a whole, not

21  just subsets.

22           The issue is, you can't just turn on a tap -- you

23  can't turn on a switch and just have 55 CFM air and 59-degree

24  temperature air coming out.  That's not how it works.

25           We talked about how hair dryers that you get have

1   much more variance because they don't need to do anything as

2   specific as stay at a level that kills lice but doesn't burn

3   the scalp over the course of the treatment.  That's what all

4   that work went into, into maintaining that window.  That's what

5   was talked about, the AirAllé, and just wasn't out there in any

6   other product.

7           Next, please.

8           So we talked about why the -- you know, we've got

9   this definition of trade secrets.  At the top -- I'm not going

10  to read that all to you.  The point is that it's very broad.

11  It can cover pretty much any kind of information as long as it

12  meets the requirements that are under it.  And one of the key

13  ones, the most important one and the most confusing one, I

14  think, is the information is not generally known to or readily

15  ascertainable through proper means by another person who can

16  obtain an economic value from it.

17          Well, we know that everything in there is not readily

18  ascertainable because the only way that you can get your hands

19  on the AirAllé device is through a contract that says that

20  you're going to keep it confidential.  And so you can't do

21  anything with that device without breaching that agreement, or

22  do anything that's going to be useful in accessing the trade

23  secrets in it.  And, of course, that's what the defendants did

24  here.

25          Excuse me.

1          But we also know that it's not generally known.

2     There was no other machine like this on the market.  They had

3     to build it from scratch.  That's why it took them four years

4     to get it to market and another three years to finalize it.

5          Sure, the fact that any given component is -- is, you

6     know, off-the-shelf product has nothing to do with it.  Coke is

7     a trade secret.  The recipe for Coke is a trade secret.  The

8     ingredients are right on the can.  That doesn't tell you

9     everything you need to know about how to make it.  Water is

10    generally known.  Sugar is generally known.  But how they work

11    together to make the product that dominates the world, that's a

12    trade secret.

13         And how these off-the-shelf products -- and some of

14    them are partially custom designed, some of the -- I think the

15    motor was modified, I think we heard from Mr. Beck.  And, of

16    course, the software was custom.  And how these all interact.

17    These had to be specific to those outputs that were found

18    already to be efficacious against lice treatment.

19         I'll tell you the best way to know that those things

20    aren't generally known or readily ascertainable is how many

21    times they had to go back to that machine, the defendants, in

22    their development process.  If it was so easy to do this, and

23    all they had to do was buy the Flying Pig, then why did the

24    development process not stop on March 1, 2017?  Why did they

25    have to go back and go back and go back?  Because it was

34

1    difficult, in a way that they had no way of understanding

2    because they just assumed that they could take this and learn

3    everything there was to it.

4         Everybody who opens it up finds out, "Oh, I thought

5    this was just a hair dryer."  No, it isn't.  That's the value,

6    and that's what's not generally known about this machine and

7    what's not readily ascertainable.

8         Now, there's other requirements.  We have to take

9    reasonable measures for secrecy for the machine.

10         Excuse me.  Go back.

11         And there also has to be independent economic value

12    from being secret.

13         Forward, please.

14         So we talked about that.  We're going to run through

15    Mr. Ward's testimony very briefly.  We keep the spec documents

16    on a server.  Only a few employees have access to it, even

17    though every Larada employee has a confidentiality agreement.

18    We know that the machine is only made available subject to

19    confidentiality agreements with clinic owners, with the

20    manufacturer, with -- you know, we've got agreements with the

21    IT people.  All the spec documents say proprietary and

22    confidential, property of Larada Sciences.  I don't think

23    there's really any question that Larada has taken measures to

24    keep their device secret.

25         Next, please.

35

1          We also have -- we skipped over the independent

2    economic value.  And that should be obvious, too.  This is the

3    basis of Larada's business, and it's the basis of PHS's

4    business, and it's the basis of 47 other clinics around the

5    country.

6          It's a unique, valuable device.  We've built our

7    entire company around it.  That's the value.  And it's the

8    value that attracted the defendants to it in the first place.

9    And it's the value that they kept coming back to, and that's

10   why they kept referring to the machine in the design process.

11         Next, please.  Next.  Next.  Next.  Actually, back up

12   a bit.  I'm sorry.

13         All right.  So we've covered John Fassler's breach

14   already.  We'll move through that.

15         We also have this breach of implied covenant of good

16   faith and fair dealing.  I just want to deal with this briefly.

17   The judge explained in the jury instructions that, essentially,

18   you're -- this covers the purpose of the contract.  If there's

19   a phrase -- in fact, for example, if the contract didn't say

20   you couldn't copy something and they copied the tips, that

21   would probably -- and other things obviously meant to protect

22   the information.  If the words didn't quite cover it exactly,

23   that would be the implied -- that's the implied covenant.  And

24   that's sort of just the way to cover those parts of the

25   contract that are not -- if you're dealing in good faith, if

1    they aren't exactly specified in the terms of the contract.

2            Next, please.  Next.

3            Now, we talked about the existence of the trade

4    secret briefly.  The interstate commerce issues has been

5    stipulated.  The parties agree that it's an interstate

6    commerce.

7            And so next we have the actual activeness

8    appropriation, and we've talked about this before.  It's

9    acquisition, use or disclosure.  Acquisition, use or

10   disclosure.  That's all it takes.  It's an "or."  It's not an

11   "and."  If you disclose the trade secret, you're liable.  We

12   heard Mr. Nelson say, just because you disclose something or

13   apply your trade secret doesn't mean you've caused any economic

14   damages to anybody.

15           That's not the law.  The law is what Judge Shelby has

16   explained to you, and we're going to look at specific things

17   about damages in a moment.

18           Next, please.

19           So we also want to address briefly --

20           Next.

21           -- whether what was in the -- in the patents, or what

22   was in the medical articles, whether that constitutes readily

23   ascertainable -- sorry, that it's generally known in the

24   industry because it's in some published article or a patent or

25   in *The New York Times.*

1    Now, the general shape of the machine, that's not a

2  trade secret.  So to say that everything about the device is a

3  trade secret is not exactly true.  You can look at a picture of

4  it online.  You can know it treats lice and it's got a motor in

5  it.  You can kind of know that the tip kind of looks like that.

6  But that's what you can get from a picture.

7    What you can't get is all this stuff that they were

8  doing.  You can't get thermal imaging online.  And it's not in

9  any of the patents.  It's not in any of the articles.  You

10  don't know the schematics.  You don't know any component.  You

11  don't know whether a flow sensor is in there or not.  You've

12  got some disclosure of the temperature.  But, again, the

13  disclosure of any one part of the device publicly doesn't

14  invalidate that the combination of those parts is a trade

15  secret.

16    Again, everything -- pretty much everything -- every

17  part of a Coca-Cola thing is publicly known, or a Coca-Cola

18  can; right?  You know what's in there on the ingredients, but

19  the combination is what makes it important.

20    And so even though there's publicly disclosed aspects

21  of the machine, the combination of everything else in there

22  that makes it -- makes it what it is, that's what creates the

23  trade secret protection.

24    Next, please.

25    That's No. 32 of the instruction that talks in

1    general about what I just explained about our compilations.

2    And you see at the bottom, "The public disclosure of one or

3    more of the parts of the compilation does not render the entire

4    trade secret readily ascertainable."

5            Next.  Next.  And next.

6            We talked about improper means.  There are, in this

7    case, no proper means.  Everything that happened was in breach

8    of the agreements.  Even as national medical director of PHS,

9    John's early involvement at least was a breach from PHS, if not

10    for him personally.

11            Of course, it could mean other things, people who

12    hack into computers to download files, but that's not what this

13    case is about.

14            There are no proper means of applying the AirAllé

15    device.  And there was no other benchmarking done of any other

16    device.  Benchmarking's fine.  If you have access to that

17    product legally, it's fine.  It's not fine here.  And that's

18    why we protected our device with contracts, because we had put

19    that work in and we knew that, in this situation, it would be

20    devastating to lose all that hard work.

21            Next, please.

22            So here's our unjust enrichment instruction, and it's

23    a little confusing; right?  We understand concepts like pain

24    and suffering and need and understand lost profits, to some

25    extent.  Unjust enrichment is a little bit different.  There's

1    just differences in the remedies that contract law and trade

2    secret law provide.  And part of the reason is for situations

3    like this, where some other remedy may not be the most

4    appropriate under the facts of the case.

5          And one of the things I want to direct you to on this

6    instruction is the last sentence, which says, "Regardless of

7    whether you find that Plaintiff itself suffered losses, if you

8    find that the Defendant benefited from using a trade secret

9    belonging to Plaintiff, then you should consider whether that

10   Defendant should pay the monetary value of those benefits to

11   Plaintiff."

12         That's what we're talking about.  We're talking about

13   the benefit to PHS from using the trade secret, and you should

14   consider whether that Defendant should pay the monetary value

15   of those benefits to Plaintiff.

16         Next, please.

17         This is more about the damages.  It's actually 47,

18   which is the instruction before 48, but I want to call out here

19   that you may consider, in awarding such actual damages, the

20   cost the defendant would have incurred in acquiring the same

21   information or trade secrets through its own experimentation or

22   through other lawful means.  And we'll talk about the numbers

23   later, but that's what we're asking for.  We're asking for the

24   costs they would have incurred, and the best estimate of that

25   is our costs.  And that's the work Matt Germane put in to

1    explain our costs in developing the trade secret information.

2          Next, please.

3          Mr. Germane relied on unjust enrichment theories.

4    This is from the five different kinds of ways that the -- that

5    unjust enrichment can be calculated.  It's a broad, again,

6    flexible concept in the law, again, to deal with different

7    situations, because the facts in every case are a little bit

8    different.

9          This case is pretty unusual.  You don't hear a lot

10   about franchisees of McDonald's signing a contract and then

11   just taking all the stuff they get from McDonald's and

12   putting their own name on it, because McDonald's would come

13   down on them like a ton of bricks.

14         Unfortunately, Larada is not McDonald's, and it has

15   14 employees, and just dealt with COVID.  So they have more

16   difficulty in bringing that kind of legal pressure on people to

17   enforce those rights.  And for the most part, they don't have

18   to, because most of their clinic owners are happy to have the

19   device, and they grow along as Larada grows.

20         But in this case, we've had to resort to -- to

21   lawsuits to enforce our rights with regard to our information.

22         Next, please.

23         So we also heard from Matt Germane.  He asked for --

24   he put a value on this device, $1.95 million and some change.

25         He went through the R&D expenses and R&D wages.

1    There were some questions raised as to the accuracy of those

2    numbers, or how reliable those numbers can be.

3          And, again, if Larada was some kind of, you know,

4    like Lockheed Martin, and you don't know who's working on what

5    project and how long they've been working on it, it probably

6    would be really hard to rely on the testimony of one person

7    from ten years ago who's going to tell you.

8          But Randy Black was with the company for a long time.

9    He's the "RA" in Larada.  And he knew everybody personally.

10   It's a small company.  He was able to say who worked on what

11   R&D and who wasn't there, and there really wasn't much going on

12   in the early years aside from R&D.  You couldn't go to market

13   without a product.  We cut out as much of -- of anything that

14   we could that we found that wasn't -- that didn't seem like it

15   related directly to the R&D.

16         You recall Mr. Abarca asked whether the translation

17   into Norwegian had been included, and Mr. Germane pointed out

18   that it hadn't been.  And we've also cross-referenced these

19   numbers against the payroll taxes to make sure those are

20   accurate and used the best information we can.

21         Now, going forward from 2009, we actually have better

22   backup in the documentation.  But those early years, '07, '08,

23   that's where those payroll records are missing.  And nobody

24   would know better than Randy.  As Matt pointed out, even if

25   Matt was watching, he wouldn't be able to tell you what work

1   goes to patents, what work goes to trade secrets, without the

2   assistance of some engineer explaining that to him anyway.

3          I've also explained how, going forward from 2010,

4   once the device hits the market, how there's further

5   development work and that how that development work also

6   contributes to the value of the device; keeps it more reliable,

7   and makes it something that people are going to want to grow

8   their business with, the way that the Defendants grew PHS with.

9          So just to tie up trade secrets a little bit.  You

10  know, we've got these four trade secrets.  They'll be described

11  on your jury form.  You don't have to -- you don't have to

12  decide which one is the most important or whether they all

13  exist.  As long as there's one there, our damages figure stays

14  the same.

15         I want to discuss just briefly, again, the way that

16  we have these direct use of the machine, the relative testing

17  of the machine, copying of the parts, pictures of the

18  components, reaching out to suppliers, material tests on the

19  hose; everything they can learn that you can't learn from just

20  looking at the machine, and they try to extract from it.

21         Why did they not just copy it all the way?  Well, we

22  heard there was some talk of just reskinning the existing

23  machines.  But the real issue is that's expensive.  Those parts

24  are expensive and complicated.  And to recreate that is not

25  what they were looking for.

43

1      And that kind of brings me to one more issue that we

2  haven't addressed yet.

3      Next, please.

4      So we have what's called exemplary damages.  And

5  "exemplary" can mean you did a great job.  But I think, in this

6  context, it doesn't mean that.  It means that you're making an

7  example of somebody; and, in this case, they may be awarded an

8  amount not more than two times the amount awarded for unjust

9  enrichment.

10      So you don't have to take our word for that unjust

11  enrichment figure.  It's up to you to figure out what the

12  damages are and what the trade secret is worth.  But we're

13  going to ask that whatever number you come up with, you take

14  that and double it, and there'll be another line for exemplary

15  damages when you look at the verdict form.

16      But to do that, you have to say that the

17  misappropriation was willful and malicious.  And, as always, we

18  have an instruction to tell us what that means.

19      Next, please.

20      So here's the words I want to really direct your

21  attention to.  "An act is willful if it's done voluntarily and

22  intentionally and with the specific intent to commit such an

23  act."  And "the act is malicious if it's done with such gross

24  indifference to the rights of others as to amount to a willful

25  act done intentionally without just cause or excuse."

**44**

1       "Gross indifference to the rights of others."

2            Let's go back to 2009 and talk about the rights of

3    others.

4            There's no PHS without Larada.  Sheila Fassler

5    incorporates PHS to use this device in her clinics.  They open

6    in 2010.  They got one device.  They're mobile.  But it's not

7    long before they have a permanent location.  It's a good

8    machine.

9            Next, please.

10           And they've got a growth mindset.  You heard it from

11   Sheila herself.  They re-sign with Larada in 2013.  They're

12   growing their clinic business.  They're getting more machines.

13   And it's not long before PHS becomes one of their top clinics.

14   And that's a credit to the Fasslers.  We have a lot of clinics.

15   Not all of them are the top clinics.  Not everybody gets as big

16   as they did.  And that's based on their work.  Based on the

17   machine, too, but it's a credit to them.  They know what

18   they're doing.

19           And that's 2013.  They've re-signed.  2012 and 2014,

20   they're still in a growth mindset; right?  That's when they're

21   getting close to Larada, joining the advisory board, knowing

22   what Larada is doing next, knowing what its plans are.

23           But at the same time, they're never telling Larada

24   that they're working with an engineer to measure the device, to

25   know how it works, to understand its output specs, to look for

45

1     a replacement.

2            John Fassler becomes the national medical director of

3     Larada.  They sign new agreements in 2015, knowing that they've

4     already gone to an engineer to work with our devices.

5            Now, that growth mindset never went away.  In

6     December 2016, January 2017 --

7            Next, please.

8            -- they're spending money for the new PHS clinic.

9     They're spending money on a new PHS clinic.  They refit one and

10    they double -- I think, to double its size, and they're opening

11    up another one.  $30,000 for Charleston.  $15,000 for Raleigh.

12    That's $45,000 over the course of two months that they invest

13    in the business.

14           And that's not enough.  They're also going to take a

15    loan out to buy the building that they're in, in Charlotte.

16    And they're paying Kevin Dahlquist what Sheila called a nominal

17    amount.

18           And that's the moment where they decide where they're

19    going to save money is by cutting out Larada, or at least

20    getting a deal out of them.  So she says to Claire, in that

21    email on February 1st, "I've had to delay paying my usage

22    fees."

23           Not asking, "Do you think it's okay?"

24           I'm telling you, "I'm not going to pay."  Not because

25    the clinic is underwater, literally, or that there's a power

1  outage or there was some disaster.  "I'm taking out a loan."

2  Growth mindset.  "I'm going full steam ahead."

3       Because they know -- they already have the open

4  picture.  They have the specs.  They know, or they think, that

5  the Flying Pig is going to set them free.  That's what they --

6  they're wrong.  But they're wrong about a lot of things in this

7  case.  They're wrong about that.  They're wrong about their

8  ability to just stop paying Larada, which we found out, you

9  know, when the breach -- the breach of contract that was

10  already settled.  That's been resolved.

11       They're wrong about the Flying Pig being the easy

12  solution.  But they didn't know that yet.  Instead, they

13  decided they were going to play hardball and try to get a deal

14  out of Larada.  Claire called their bluff and said, just,

15  "You've got to pay.  You've got back fees.  You've got to pay."

16       Before there's any termination letter, they've got

17  the Flying Pig on the way.  So almost a month before the

18  termination letter, the Flying Pig is ordered.  They know

19  what's coming.

20       And then you heard testimony that says, "Well, it was

21  the home treatment kit.  I was worried about that.  It was

22  going to eat into my business," the business that they'd worked

23  so hard to build.  It's understandable.  You're a business

24  owner.  You're worried about new products.

25       But you also heard Claire say she heard that

**47**

1   feedback.  Larada worked with them to allay those concerns and

2   was also, you know, still working on the 2.0 device because

3   that was important to clinic owners as well.

4        And here's the most important part.  If you think

5   that a home treatment device sold on Amazon is going to eat

6   into your clinic business, then you don't turn around and

7   develop a new clinic -- device that you're going to start

8   selling to everybody else.  That's not how it works.  You'd

9   make a home treatment kit.  You'd go do something else.  They

10  made a new clinic device.  They don't think that the home

11  treatment kit is going to eat into their business.

12       And that's the plan all along.  2016, November,

13  Dahlquist says, "Oh, yeah, we were going to reskin those

14  machines.  We went a different path."  The Flying Pig path, but

15  still, a competing device.

16       In March of 2017, Dahlquist says, "We were ready to

17  do on the scale of hundreds."  In March.  They don't even know

18  if it works yet.

19       And then, by the time we're going to Enventys --

20  here's what he says.  "I can't get -- I'm not a factory.  I

21  need Enventys to get on the scale of thousands."

22       Kevin has to go to China to source motors for

23  production.  They're signing $100,000 production deals with

24  Enventys.  You don't go into production to sell this stuff all

25  over the country before you even know it works, before it's got

1   FDA clearance, if you don't have understanding -- if that's not

2   what -- sorry -- if you think that the home treatment kit is

3   really going to eat into your business.

4           This is just growth mindset.  They don't care.  What

5   Larada's got doesn't matter, and they have no respect for it.

6   They opened it up and found it might be a little bit tougher,

7   and that's evidenced by how long it's taking them to get their

8   machine.  But they had a functioning prototype -- well, they

9   had the Flying Pig -- in weeks.  It had a lot of problems, but

10  that's why they kept working on it.  And they were able to

11  market within a year, while it took Larada, with all its

12  engineers, four, and they had nothing to work from.  They

13  worked from scratch.

14          So they think that that's -- you know, they're in

15  negotiation again.  It took a machine that took at least

16  $2 million -- almost $2 million to make, and now they want

17  their expert to tell you, you know, we should get that for

18  $100,000.  They're negotiating in bad faith again.  That's --

19  you know, $100,000 or less, if you feel like it.  That's what

20  we heard yesterday.

21          We know how much work went into this, and how much

22  value it has to them, both in building their business in the

23  first place, and then copying what they learned from it.

24          And I think this says it all on 204.  "We have been

25  working on this project since 2014."  We're excited.  We are

1    finally coming down the finish line.

2         That's always been the plan.  They have no respect

3    for the work that Larada put in developing this product.  They

4    have no respect for the contracts they signed.  They're

5    sophisticated businesspeople.  They run a very successful

6    business.  They're going to market.  Their intention is to

7    compete with us.  They're going to compete now.  They are

8    competing now, they will compete in the future, and that's why

9    we've come to you to resolve this issue.

10        Next, please.

11        So this is the verdict form.  We've seen this --

12   there's only the one.  And so it starts with the breach of

13   license agreements against Pediatric Hair Solutions.  We know

14   that Pediatric Hair Solutions' employees were also involved in

15   this process.  Dana Buffo is forwarding parts.  She's involved

16   in a lot of this stuff well after 2015.

17        Sheila, of course, on behalf of PHS, involved in

18   almost every phase of the prospect, making parts available,

19   making devices available, holding on to the AirAllé device

20   after -- after the agreement's terminated.

21        The problem is, for us, the contract damages are --

22   have limitations on them.  And in the facts of this case, what

23   we're asking for is damages on the license agreement of $1.

24   That's the nominal damages that you heard the judge explain.

25        Of course, as we'll talk about in trade secrets, if

1    we're going to base our trade secret claim on breach of some

2    duty, some duty of confidentiality, you necessarily have to

3    have these breach claims.

4          Then the next one is the duty of good faith and fair

5    dealing against PHS, and then we talked about that already.

6    That's in those cases where you're worried that -- you think

7    that they violated the spirit of the contract without any

8    particular term.  So if you feel like that's the case, then you

9    should answer that yes.

10          Next, please.

11          And you can also award $1 on that one.

12          Similarly, with the lease agreement from Sheila

13   Fassler, we just talked about her involvement in every phase of

14   it.  Her personal liability, I think it's clear, that's a clear

15   yes.  And, again, we're asking for $1.

16          And for Dr. Fassler, again, we talked about, he's got

17   that later date contract.  So the evidence on breach has to be

18   based on stuff he does after that.  But we talked about his

19   use, his failure to stop the use, and all those actions; his

20   acquisition of the Flying Pig, and his involvement in the test

21   study that validates the AirAllé device versus the FloSonix.

22          Next.

23          This is where we are asking for our unjust enrichment

24   damages, under misappropriation of trade secrets claim.  And

25   all you have to say is have we proven that a trade secret has

1  been misappropriated by that Defendant.  And we believe, for

2  all four, the answer is yes.  And that for all four, the

3  compensatory damages are that number that Matt Germane

4  calculated.

5          Again, it's up to you to figure out what that number

6  is, based on all the evidence in this case, but we've supported

7  that with the documents that we have.

8          And then the next question for each defendant is was

9  that misappropriation willful and malicious.  And that's what I

10  just talked about.  You know what really happened here.  You

11  know what the plan was.  This was willful and it was malicious

12  in the sense that those terms are used with regards to

13  exemplary damages.  So we ask that you answer that question

14  yes.

15          If you answer that question yes, you're not required

16  to award exemplary damages or do them in the amount that I've

17  put there, but the maximum you can do is -- whatever number you

18  put in the compensatory damages line, the maximum you can do is

19  twice that number.  And that's what I've put here.  It's a

20  little -- you know, compensatory was a little less than 2.

21  Exemplary is a little less than 4.  And that's the same entries

22  for each of these Defendants.

23          Next, please.

24          Now, all this -- all this activity was hidden from

25  Larada until -- until it filed suit.  Couldn't have made the

52

1    case without the documents we've shown you and taken a lot of

2    time to painstakingly go through.  I'm not in the room when

3    Kevin Dahlquist was working with the machine.  I'm not on the

4    calls.  I don't know what's going on with the meetings.

5        I've showed you what I can prove: repeated use,

6    repeated disclosure.  Any of it supports our damages theory.

7    And we ask that you deliver the findings that I've requested on

8    the verdict form.

9        Again, I thank you for your time, and I appreciate

10    your attention to this case.  Thank you.

11        **THE COURT:**  That was a little over an hour.  And for

12    our court reporter, it was two hours.  So we, for sure, need to

13    take a break for her and let her stretch her fingers.

14        Why don't we all stretch our legs for a few minutes,

15    then we'll come back.  Let's make it a relatively brief recess.

16    I think we want to get through closing before lunch so that

17    you'll have a chance to work while you're eating today.

18        So let's try to come back in about ten minutes.

19    Thank you.

20        **THE COURTROOM DEPUTY:**  All rise for the jury, please.

21        (Jurors exit the courtroom at 11:51 a.m.)

22        **THE COURT:**  We'll see you in a few minutes.  Thank

23    you.

24        (Recess taken by the Court at 11:51 a.m.)

25        **THE COURTROOM DEPUTY:**  All rise for the jury please.

1          (Jurors enter the courtroom at 12:08 p.m.)

2          **THE COURTROOM DEPUTY:**  Please be seated.

3          **THE COURT:**  One moment, Mr. Marshall.

4          Nobody asked me to say this, and I didn't tell

5   anybody that I was going to say this, and I don't need to say

6   this, I'm sure, but I just want to stress I've been giving

7   Mr. Stasiewicz a lot of grief during the trial about how fast

8   he talks.  It's not a commentary about his case or clients or

9   something else.  It's just good-natured ribbing, you

10  understand.  It's not intended to relay anything to you about

11  the case or what you should be doing as jurors, of course.

12          Mr. Marshall.

13          **MR. MARSHALL:**  Thank you, Your Honor.

14                       **<u>CLOSING ARGUMENT</u>**

15  BY MR. MARSHALL:

16          Eight days ago I said, "A flying pig would set my

17  clients free."  I got some funny looks, not too surprising.

18  Then we talked a little bit afterwards throughout my opening

19  about what that means.

20          But also on that day my friend and colleague on the

21  other side here said, among others things, "The evidence will

22  show that PHS -- PHS used all of the AirAllé to create a

23  competing device."

24          And we've heard my other friend here say "The

25  evidence has shown that there was continued and repeated use of

                                                            **54**